## UNITED STATES v. NARDONE et al.
### No. 342.

Circuit Court of Appeals, Second Circuit.
June 14, 1937.

Thomas O'Rourke Gallagher, of Brooklyn, for defendant-appellant Nardone.

Joseph P. Nolan, of New York City, for defendants-appellants Callahan and Brown.

Louis Halle, of New York City, for defendant-appellant Gottfried.

Lamar Hardy, U. S. Atty., of New York City (Lester C. Dunigan, Asst. U. S. Atty., and Maxwell S. McKnight, Sp. Asst. U. S. Atty., both of New York City, of counsel), for the United States.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The appellants were indicted in the Southern District of New York, tried and convicted on all counts, and sentenced. The indictment was in three counts. The first count charged the violation of 19 U. S.C.A. § 1593(a), as principals under 18 U.S.C.A. § 550, by smuggling a large quantity of alcohol into the Port of New York; the second count charged the violation of 19 U.S.C.A. § 1593(a), by receiving and concealing the smuggled alcohol in the Southern District; and the third count charged a conspiracy to violate the above-mentioned statutes contrary to 18 U.S.C.A. § 88.

The evidence, much of it circumstantial, was sufficient to justify the jury in finding that, in accordance with a preconceived plan agreed to by the defendants either at the beginning or as progress was made, they and others who were not indicted, but who will all be referred to as the conspirators, caused 2400 cases of alcohol to be shipped about the 28th day of December 1935 from St. Pierre, Miquelon, on the British oil screw Isabelle H., to be smuggled into this country without payment of duty. That boat anchored for about two weeks off Yarmouth, N. S., waiting for another boat called the Pronto. For some time before that the Pronto had been undergoing repairs at New London, Conn., at the expense of some of the defendants, who sent the funds to pay for them from New York. About the 26th of October, 1935, the Pronto sailed from New London for Yarmouth, N. S., where her repairs were completed, also at the expense of some of the defendants and partially with parts ordered by them in New York and sent to Yarmouth. About January 12, 1936, the Isabelle H. picked up the Pronto at Seal Island off Yarmouth and towed her empty to a point off the coast of South Carolina, where 800 cases of the alcohol were transferred from the Isabelle H. to the Pronto, which was seized and her crew arrested while trying to run past the Coast Guard. Learning of this, the Isabelle H. put into St. George, Bermuda, where

she remained for some time under the observation of the United States Coast Guard. While there, those in charge of her communicated with the conspirators in New York and were sent some funds for expenses. While the Isabelle H. was at St. George, the conspirators, Nardone and one Leveque, tried to obtain a boat for use in bringing the 1600 cases of alcohol remaining on the Isabelle H. to New York. They met with others frequently at the Hotel Astor and at the Belford Restaurant in New York, where many telephone calls were made and received. Some of these calls enabled defendant Gottfried to talk with Leveque and defendant Callahan and with one Conrad Mathiasen of the Mathiasen Towing Company.

On March 15, 1936, the S. S. Southern Sword, owned by the Alco Steamship Company, of which defendant Callahan was president, was at Newport News, Va. She had been in command of Capt. Pendleton, but he had been relieved by Callahan of his command and replaced by defendant Brown when on March 16, 1936, the boat sailed with a cargo of coal for Bridgeport, Conn. That night in clear weather the Southern Sword met the Isabelle H. at sea off Winter Quarter Lightship and took aboard the 1600 cases of alcohol. Capt. Brown testified that he supposed the cases held cans of shellac, but there was evidence that he had before stated to a member of the crew that he was to receive alcohol and that he for a moment thought he was transshipping shellac in fair weather at sea from the Isabelle H., a vessel not in distress, is too preposterous for serious consideration.

The Southern Sword made New York Bay the next night and was met near Governors Island by defendant Callahan, who went down to her on a tug of the Mathiasen Towing Company, boarded her, and then went back on the tug. Then the Southern Sword went up North River to Pier 72, where she discharged the alcohol surreptitiously and then proceeded with her cargo of coal to Bridgeport, Conn., where her regular captain, Pendleton, resumed command. In this way the 1600 cases, containing 9,600 gallons of alcohol, were smuggled into New York.

On March 20, 1936, the Southern Sword was seized at Bridgeport and the defendants were arrested, some of them at the Belford Restaurant, where Gottfried tried to get rid of some papers having to do with the business. That all the defendants were parties to the unlawful agreement and that all of them actively assisted within the Southern District of New York in carrying it out was shown too plainly, though in part circumstantially, despite such denials as appear in the record, to make it profitable to attempt any further analysis of the evidence. The claimed errors in the trial alone supply all reasonable basis for seeking reversal.

Of these all are merely frivolous except those which relate to the introduction into evidence of information obtained by wire tapping. It appeared that for some time before the defendants were arrested they had been under the observation of federal agents, and that about 500 of their telephone calls had been made while government agents were listening in and taking notes in so far as possible of what was said. Of these the prosecuting attorney selected 72 messages for introduction into evidence. They had a vital part in the government's proof and, if they were erroneously admitted, reversal must follow without question.

Before discussing the main objection to them, notice should be taken of one between defendant Nardone and an otherwise unidentified person called Eddie. It had to do with "the fellows up above," of whom three had been indicted in the state court. They were "supposed to surrender but one of them got killed." The suggestion was made "that the rap is going to be turned over to the Federal authorities," and Nardone told Eddie to leave the amount of money needed to their discretion. This was objected to as soon as read as having no connection with the case and, because prejudicial to Nardone, a motion was made for a mistrial. That was denied but, as the government attorney could not show the connection of the message, the court with his consent decided to strike out the evidence. Defendant Nardone's attorney expressed doubt as to the effectiveness of that and, insisting that the error could not be cured, declined the offer of the court to read just what was being struck out and stood upon his motion for a mistrial. Thereupon the court said to the jury: "February 25th, 1936, is stricken out. Gentlemen, do not consider it in any way at all, but take it out of your mind. That applies to any testimony stricken out during the trial." If incurable error was committed in reading this message to the jury, it is obvious that no harm was done

any defendant but Nardone. The harm, if any, to him consisted in the showing of his interest in and willingness to help some unknown persons who had been indicted in a state court. The vice lay mainly in the guarded language used, for a willingness to assist one accused of crime is not in itself reprehensible. The general atmosphere of wrongdoing hurt here if anything about the message did. Then, too, it is impossible to excuse the reading of a message which by its terms referred only to the claimed infraction of some state law having apparently nothing to do with the subject matter of the indictment on trial. But, after all, the harm, if any, was so general and vague that we are not prepared to say that it was not cured by the prompt action of the court. Besides that, any doubt about it should be laid aside in view of the fact that the charges against Nardone in the indictment in this case were by competent evidence so clearly proved that a reversal on this point would be a plain miscarriage of justice. Under such circumstances, 28 U.S.C.A. § 391, is to be given effect. Tingley v. United States (C.C.A.) 34 F.(2d) 1.

A more serious matter relating to the introduction of all the messages and which is applicable to all the appellants concerns their admissibility in view of 47 U.S.C.A. § 605, which is a part of the Federal Communications Commission Act of June 19, 1934 (48 Stat. 1064), and was a part of the Radio Act of 1927 (44 Stat. 1162). That section forbids the unauthorized publication of communications by any person "receiving or assisting in receiving, or transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio," and thus far cannot apply to this case, as the government agents who listened in were not assisting in the receipt or transmission of any messages. But the section also provides, with exceptions not here relevant, that "no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person." We take it for granted that this refers only to interstate and foreign messages. There were enough of them introduced in evidence so that we need not now

be concerned with any distinction between what were purely intrastate messages and what were not. That aside, decision turns upon whether, assuming that the interception of the messages was unlawful, their introduction in evidence was error. The Supreme Court in Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 568, 72 L.Ed. 944, 66 A.L.R. 376, decided June 4, 1928, considered the admissibility of evidence in a Federal court obtained by a government officer by tapping a wire in violation of a criminal statute of the state of Washington and held it admissible, suggesting that, "Congress may, of course, protect the secrecy of telephone messages by making them, when intercepted, inadmissible in evidence in federal criminal trials, by direct legislation, and thus depart from the common law of evidence. But the courts may not adopt such a policy by attributing an enlarged and unusual meaning to the Fourth Amendment."

The above-mentioned statute subsequently passed by Congress is silent as to the admissibility of messages intercepted contrary to its provisions. As Congress did not see fit to adopt the suggestion of direct legislation to make such evidence inadmissible, we are, of course, bound to enforce the law as declared in the above case. That would dispose of the point flatly were it a state rather than a federal law which forbade the interception of these messages. Yet in principle there is no distinction. Since there is no constitutional prohibition of their admission in evidence, it is necessary to their exclusion that some statute must so provide. Evidently Congress did not care for such a policy. As Chief Justice Taft said: "A standard which would forbid the reception of evidence, if obtained by other than nice ethical conduct by government officials, would make society suffer and give criminals greater immunity than has been known heretofore." Olmstead v. United States, supra.

Nor were they inadmissible because the agents were unable to testify that they took down verbatim all that was said. Olmstead v. United States (C.C.A.) 19 F.(2d) 842, 53 A.L.R. 1472; Schoborg v. United States (C.C.A.) 264 F. 1.

Judgment affirmed.