## UNITED STATES v. WEISS et al.
### No. 150.

Circuit Court of Appeals, Second Circuit.
April 10, 1939.

Writ of Certiorari Granted June 5, 1939

See 59 S.Ct. 1043, 83 L.Ed. ——.

350

Lloyd Paul Stryker, of New York City (Lloyd Paul Stryker and Harold Shapero, both of New York City, of counsel), for appellant Weiss.

Schwartz & Frohlich, of New York City (Theodore Kiendl and Arthur Schwartz, both of New York City, of counsel), for appellant Dr. Goldstein.

Sylvan Schwartz, of Washington, D. C., for appellant Dr. Krupp.

Jacob W. Friedman, of New York City, for appellant Gross.

Lamar Hardy, U. S. Atty., of New York City (John F. Dailey, Jr., and Irving R. Kaufman, Asst. U. S. Attys., both of New York City, of counsel), for the United States.

Before AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The appellants J. J. Weiss, Gross, Dr. Krupp and Dr. Goldstein were convicted under Title 18, Section 338, U.S.C., 18 U.S.C.A. § 338, of the use of the mails in the execution of a scheme to defraud, and under Title 18, Section 88, U.S.C., 18 U.S. C.A., § 88, of a conspiracy therefor. The scheme involved was to defraud insurance companies by filing false claims representing that the defendants Nelson, Berger and Spitz were permanently and totally disabled when in fact they were not. All three claimants pleaded guilty and testified for the government. Three doctors participated in the scheme, to wit, the defendant Messman, who testified for the government and pleaded guilty, and the defendants Goldstein and Krupp, who stood trial. The other defendants who were indicted for the scheme were the defendants J. J. Weiss and A. L. Weiss, lawyers, and Martin Gross, their runner. Owing to illness the defendant A. L. Weiss obtained a severance during the course of the trial. Defendant J. J. Weiss stood trial and toward the end of the trial conceded that there was no doubt that the claims of defendants Spitz, Berger and Nelson were fraudulent. The chief issue of fact for the jury was whether the defendants who stood trial and have taken an appeal, namely, Weiss, Gross, Dr. Krupp and Dr. Goldstein, participated in the filing of the false claims with guilty knowledge.

Before discussing the merits of the case, we shall deal with the evidence of telephone communications intercepted by means of socalled "wire tapping" by government agents. The appellants say that the admission of that evidence was an error sufficient in itself to call for the reversal of the judgment, irrespective of any other objection. They chiefly rely on the decision of the Supreme Court in Nardone v. United States, 302 U. S. 379, 58 S.Ct. 275, 82 L.Ed. 314, which was rendered on an appeal

from this court. United States v. Nardone, 2 Cir., 90 F.2d 630. There both interstate and intrastate telephone messages were intercepted through wire tapping and used as proof in a criminal trial. We held that under Section 605 of the Federal Communications Commission Act, U.S.C. Title 47, Chapter 5, § 605, 47 U.S.C.A. § 605, interstate communications were not inadmissible and assumed that the act did not cover the intrastate messages. The Supreme Court reversed our decision on the ground that the use of interstate messages as evidence was essentially forbidden by the clause of § 605, supra, which provides that: "no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person". In reaching the above conclusion it cannot be supposed that the Supreme Court was intending to deal with anything but the admissibility of interstate communications, for they were the only messages, the reception of which we had treated as open to doubt. Moreover, the context of the Federal Communications Act seems to limit the application of § 605 to interstate and foreign messages. As declared in the first section of the act, U.S.C. Title 47, § 151, 47 U.S.C.A. § 151, the Communications Commission was created for the purpose "of regulating interstate and foreign commerce in communication by wire and radio". In the next section, 47 U.S.C.A. § 152, it was provided that:

"(a) The provisions of this chapter shall apply to all interstate and foreign communication by wire or radio * * *.

"(b) Subject to the provisions of section 301, nothing in this chapter shall be construed to apply to or give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service of any carrier, * * * *".

It is argued that because the clause of § 605 on which the Supreme Court relied in Nardone v. United States, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314, is general in its language prohibiting interception and disclosure of communications while the other clauses of § 605 are in terms limited to "interstate or foreign communication" it embraces intrastate messages. This seems to us a forced construction which flies in the face of the first and second sections of the act that we have quoted. Moreover, the third clause of § 605, which provides that "no person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by wire or radio and use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto" contains a limitation to interstate and foreign communications which is repugnant to the supposed unlimited prohibition of the second clause. It should also be noticed that the second clause of Section 605, which was relied on by the Supreme Court in Nardone v. United States, supra, prohibits intercepting and divulging or publishing the contents of intercepted messages. It cannot be maintained that intercepting alone is prohibited and that the clause relates to intrastate as well as to interstate and foreign messages because interception would affect both. Divulging one or the other can be readily dealt with separately and the section as a whole seems only to forbid divulging interstate or foreign messages. We, therefore, regard the decision of the First Circuit in Valli v. United States, 94 F.2d 687, rather than that of the Sixth Circuit in Diamond v. United States, 94 F.2d 1012, or of the Third Circuit in Sablowsky v. United States of America, 101 F.2d 183, as properly interpreting § 605. We realize that in Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944, 66 A.L.R. 376, three of the minority took the view that wire tapping in violation of a state penal statute was so contrary to good morals that messages thus obtained ought not to be admitted in evidence in a United States court, and that Justices Brandeis, Butler and Stone said that the messages were obtained in violation of the Fourth Amendment of the Constitution, U.S.C.A., and their admission under objection was a violation of the Fifth Amendment. In the present case, however, no law of New York prohibited obtaining messages by wire tapping. Messages thus obtained are admissible in the New York courts and the government in using them was not accepting the fruits of a crime as in Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944, 66 A.L.R. 376. We are bound by the decision of the majority in the latter case and are impressed by the omission of the Supreme Court to say that Section 605 is broad enough to include intercepted intrastate messages though it relied on that section to support its decision in Nardone v. United States,

302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314, that intercepted interstate messages were improperly admitted in evidence. In spite of some hesitation because of the decisions in Sablowsky v. United States, 3 Cir., 101 F.2d 183, and Diamond v. United States, 6 Cir., 94 F.2d 1012, and of the dissenting opinion of Judge Morton in Valli v. United States, 1 Cir., 94 F.2d 687, we hold that there was no error in admitting the proof derived through wire tapping.

■ The point is made that one of the communications obtained through wire tapping and admitted in evidence (Exhibit 307) was an interstate call. That conversation was between Weiss in New York and Gross, whose definite whereabouts was not shown. But Gross once testified that he was in the traffic court at the time he called up Weiss. He afterwards said that he did not remember where he was. In the transcript of the conversation he, however, said to Weiss: "I'll be down in a few minutes". It is hard to believe he would have said this if he had been outside the state. We think there was enough to justify the trial judge in holding that Gross was within the state at the time and that the communication was intrastate.

■ It is argued, that even if the conversations obtained through wire tapping were erroneously admitted, the error was not prejudicial because the factum of the conversations was conceded by the defendants affected. This argument is not convincing. It may be said with some plausibility that the defendant Goldstein was not prejudiced since he was neither a party to, nor mentioned in, the conversations obtained through wire tapping. These conversations, however, showed that Goldstein's codefendants were engaged in a conspiracy which other proof indicated that he joined. They also gave credence to the testimony of Messman. Such evidence weighed against Goldstein and his conviction ought not to stand if the communications implicating the others were improperly received. As regards the defendant Krupp, he seems to have admitted the conversations in which he was concerned. But it cannot be said that evidence which he was compelled to explain and justify was not legally prejudicial if improperly admitted under his objection. The defendant Gross denied some of the conversations relating to him which were obtained through wire tapping. He was prejudiced by Exhibit 142 containing an alleged conversation between himself and Nelson as to one Blumberg which he testified in fact referred to a person he only knew as Bromberg and not as Blumberg. Another alleged conversation between Gross and Weiss contained in Exhibit 307 and relating to fees to be charged by Weiss to one Spitz was not admitted by Gross and was highly prejudicial as tending to support the government's contention that Gross was a "runner" for Weiss. But even where the conversations were not denied or were conceded he was legally prejudiced by having to explain and justify evidence which he had challenged at the outset, unless it was properly admitted. The defendant Weiss is in the same position and his conviction can only stand if we are right in holding that the communications derived through wire tapping were competent evidence. Weiss, who was a party to conversations obtained through thirty-four wire taps, was prejudiced by their admission unless they were lawfully received in evidence.

■ There can be no doubt that the government offered sufficient proof to go to the jury on all the evidence submitted.

It is not questioned that Messman, Spitz, Berger and Nelson were engaged in committing frauds upon insurance companies through the filing of false claims representing that Nelson, Berger and Spitz were disabled when in fact they were not. There likewise can be no doubt that each of the appellants assisted in promoting at least some of the claims against the insurance companies. The defendant Weiss assisted in all three cases, as did Gross. The defendant Krupp gave a medical certificate in the Spitz case, the defendant Goldstein gave a certificate in the Nelson case.

The trial judge directed the attention of the jury to the evidence showing conscious fraud on the part of the appellants. In respect to the proof against the defendants Weiss and Gross, he charged the jury that the testimony was to the general effect that Gross suggested the idea of creating false claims and asserted that he could put claimants in touch with a doctor who would tell them how to feign disease and deceive a company, and with lawyers who would direct the legal steps. The judge charged that there was testimony that Gross took the claimants to Messman, "who prepared fictitious histories for them, told them what pains to complain of, in the cases of Nelson and Berger gave them

pills, digitalis or urginine, which would affect the electro-cardiogram or e k g that might be taken of them, and arranged to send them to hospitals, for which services Messman testified he was to receive substantial fees out of the moneys expected to be realized."

The Judge went on to say:

"Nelson and Berger testified that for some days before medical examinations they would take these pills, although neither of them liked them, and Nelson I believe testified they made him nauseous. These witnesses testified separately that they were brought separately to Weiss by Gross or Nelson or Messman and that Weiss passed upon papers they sent out; gave general directions; in the case of Spitz financed some of the hospital expenses and premium expenses; and Nelson and Berger testified that they were told to prepare for examination by Weiss. If the testimony of each of these four witnesses, or any one of them, is true in the main, then Gross and Weiss were active participants in the scheme and had guilty knowledge of the fact that the claims were fraudulent.

"There is testimony that in the Spitz case no directions were needed to be given and he did not take any drugs; and there is testimony that in the Spitz case a quarrel developed as to the size of the fee which the lawyers should have, which resulted in the lawyers eventually not taking up, or dropping, the Spitz case.

"Mrs. Berger was also a witness and she testified relative to the defendant Gross. According to her testimony she wanted Berger to get out of it. She was visited by the defendant Gross, so she said, that he came around and told her that she should not worry, that there was good money in it, the companies could afford to pay, and that people richer than she and Berger were doing it.

\* \* \* \* \* \*

"As to the defendant Goldstein he is charged with having assisted in the Nelson claim, knowingly assisted in the Nelson claim, and the witnesses as to that phase of the case are Messman and Nelson. Spitz and Berger had no testimony to offer in that connection.

"Messman testified in substance that when he brought Nelson to be examined by Goldstein on December 19, 1934, he told Goldstein that he had been giving digitalis to Nelson, and, in substance, that it was a fake case. He testified that an e k g was taken on that day, which Goldstein told him later was 'not so hot'. He testified further that he later induced the defendant Goldstein to antedate an e k g, which he said was taken on July 15th, to antedate it to an earlier date, June 17th.

"The government claims that several papers around the summer of 1935 tend to bear out the testimony of Messman relative to the date when the e k g was actually taken. Nelson testified that an e k g was taken on December 19, 1934, and he testified that certain dates given in certificates signed by Goldstein were false; that he was not visited or treated by Goldstein on those dates.

"As to the defendant Krupp he is charged with having assisted only in the Spitz case. The testimony of Messman, Nelson and Spitz, not Berger, is to the effect that Krupp acted as Spitz's family doctor and pretended to have treated Spitz for heart attacks for a promised fee of $750. The testimony of Berger, except as to one meeting I believe, has nothing to do with the defendant Krupp."

While motions were made at the close of the case for the direction of a verdict for the defendants, there seems to have been no question about the correct summary by the Judge of the testimony against them. The errors, if any, which might lead to a reversal must depend upon the propriety of admitting conversations recorded through wire tapping, which we have already sustained, and the validity and importance of other objections, taken during the course of the trial, which are referred to hereafter.

 It is argued on behalf of the defendant Goldstein that he was not shown to have been connected with any general conspiracy to defraud insurance companies but only with a specific plan of fraudulently obtaining disability payments for the defendant Nelson from a single insurance company. This, we think, is an unnecessary limitation of the inferences which may be drawn against Goldstein. While there was no proof that Goldstein knew of the Spitz or Berger claims nevertheless Goldstein, in dealing with Nelson and Messman, showed such a familiarity with the sort of fraud involved in the indictment that a jury might well infer that he had become a

participant in a general conspiracy on the part of Messman, Weiss, Nelson and others to defraud insurance companies. The following is part of the conversation between Messman and Goldstein as to ·the Nelson claim. Messman testified thus:

"This fellow outside, his name is Nelson. He is going to be a disability case. * * * I said to him, 'You remember the Weisses are quite liberal with payments to doctors, not like the Garrows', and Goldstein said, 'As far as the Garrows are concerned, we started them with a small fee, it is just too bad, it is pretty hard to get away from a small fee.' I said, 'Don't worry about this fellow here. We will get a nice fee now.' And later I said, 'You will get a still better fee from the Weisses directly.' He said, 'What are you going to claim?' I said, 'It is a heart case, not a t. b. case.' I said, 'The reason I brought him here is that I expect to take him to the hospital, and what is on my mind I want you to take his electrocardiogram to see if he is ready to go to the hospital, because I have given him digitalis in the past four or five days.' He said, 'How much digitalis did you give him?' And I said, 'Two tablets three times a day.' He figured out aloud how many tablets that would make, and he said, 'He is ready, probably ready, but' he said, 'you know I do not develop electrocardiograms here in my office, I develop them at the Sydenham Hospital.' I said, 'How will I know whether Nelson is ready or not?' He said, 'The situation is this. Apparently he is ready if he took what you say he has taken. Assume that the electrocardiogram I am going to take right away is not positive enough, then will 'he stay· in the hospital, take another few tablets and then I will take another electrocardiogram in the hospital anyway, because that is part of the. buildup'."

Moreover there was evidence that Goldstein .had worked with Messman on the Hochberg case, that Hochberg was at the Sydenham Hospital and Goldstein extracted an electrocardiograph and tore it up. Though Goldstein denied that he tore up the test he failed to. explain on cross-examination why one copy was not part of the hospital records as it should have been. We think there was sufficient proof of a conspiracy to defraud insurance companies in which all defendants were engaged to support the jury's verdict. United States v. Graham, 2 Cir., 102 F.2d 436; Jarvis v.

United States, 1 Cir., 90 F.2d 243, 245, 246, certiorari denied 302 U.S. 705, 58 S.Ct. 25, 82 L.Ed. 544; Coates v. United States, 9 Cir., 59 F.2d 173, 174.

The point is also made that Goldstein dropped out of the conspiracy after he gave the disability certificate in the Nelson case on September 23, 1935. But there not only was testimony by Messman that Goldstein was promised "further remuneration when the case was surrendered" (record, p. 1005) but proof is lacking that he took any affirmative steps to withdraw from the conspiracy. Hyde v. United States, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114, Ann. Cas.1914A, 614; United States v. Graham, supra; United States v. Dubrin, 2 Cir., 93 F.2d 499, 504. Accordingly the jury might find, as it did, that he was still in the conspiracy at the times of the mailing of ·the socalled "indictment" letters which were subsequent to September 23, 1935. But the mailing of the letter on June 21, 1935, charged in Count 9, occurred while Goldstein clearly was a party to a scheme to defraud insurance companies, so that, even though the proof showed Goldstein to be a participant in a limited conspiracy with Messman, Nelson and Weiss, instead of a conspiracy, as we hold, with all defendants, his conviction on Count 9 and on the conspiracy count could still be affirmed, in view of the charge of the court and the evidence, without prejudicing any substantial right which he could claim. See Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314.

The contention of the defendants that the judgment of conviction should be reversed because of errors due to alleged improper cross-examination needs little comment.

 With respect to Weiss, his statement on direct that he had never had anything to do with a false claim left him open to a very broad cross-examination the proper bounds of which so far as they may have been occasionally exceeded were sufficiently cured by the admonitions of the court.

 With respect to Gross, some of the questions asked, e. g., about the activities ·of his former associate Ellentuch and about the alleged confession of Schwartz (for whom Gross had filled out insurance forms) that Schwartz's claim was· fraudulent and that Gross had suggested it, were

improper. Indeed, the latter question was ruled out. The same thing is true of certain other questions by counsel for the government which assumed facts without sufficient basis in the record. Some of these were excluded by the trial judge, who repeatedly cautioned the jury against taking assumed facts in place of proof. For example, at page 2092 of the record, he said: "The jury have been told several times that they are not to assume the facts or to take the facts as proof, just because they are assumed in counsel's questions."

He also charged the jury (page 2595): "Your verdict should be based upon the evidence alone, and not upon statements or charges that have been made that have no support in the evidence. By evidence I mean the exhibits marked in evidence and the oral testimony of the witnesses that were sworn."

It seems to us that there was such ample proof of guilt on the part of Gross that any excess zeal in the manner of cross-examination could not have affected the result.

With respect to Krupp, criticism is made of the cross-examination about a judgment by default, obtained against him by one of his patients, and apparently based upon charges of negligence. We do not think this item of evidence could have affected the result in view of the answers, but in any event regard its admission as a matter for the discretion of the trial judge.

With respect to Goldstein, complaint is likewise made of the extent of the cross-examination. In view of his own testimony on direct with reference to other disability cases, and his cross-examination of Messman as to the Hochberg case, we think the cross-examination was justified.

Some of the statements of the United States attorney in his summation are subject to criticism, but we cannot regard them as affecting the result or as anything like the damaging statements involved in Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314.

We have considered the other objections raised with respect to the conduct of the trial and find nothing calling for a reversal of the judgment of conviction.

Judgment affirmed.

NOTE: Judge MANTON sat at the argument of this appeal but resigned before the opinion was written.