### UNITED STATES v. BOB et al.
### No. 377.

Circuit Court of Appeals, Second Circuit.
July 26, 1939.

Writ of Certiorari Denied Oct. 9, 1939.

See 60 S.Ct. 115, 84 L.Ed. ——.

**38**

Raphael P. Koenig, of New York City (Koenig, Bachner & Koenig and Seymour L. Mantell, all of New York City, of counsel), for defendants-appellants Charles V. Bob and H. Tracy Rogers.

James E. Wilkinson, of New York City, for defendant-appellant William Wiseman.

John T. Cahill, U.S. Atty., of New York City (Leo C. Fennelly and Raymond Ickes, Asst. U. S. Attys., both of New York City, of counsel), for the United States.

Before L. HAND, CHASE, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

Of the defendants who appeal here, Bob and Rogers appeal from a judgment of conviction upon an indictment charging them in five counts with using the mails in execution of a scheme to defraud, and in one count with conspiring to that end, in the sale of stock of Coronado Gold Mines, Inc., and Kelly Gold & Silver Mines, Inc. 18 U.S.C.A. § 338 and 18 U.S.C.A. § 88. The third defendant, Wiseman, was not convicted on the conspiracy count and therefore appeals only from his conviction on the five counts of using the mails to defraud. In addition to the three defendants here, the indictment named as defendants two other individuals, Morse and Peterson, as to whom a severance of trial was granted, and three corporations—the two gold mine companies, together with Bankers Service Corporation (a financial advisory service) —who were convicted, but did not appeal. The indictment also named several other persons as co-conspirators, without including them as defendants. Of these, certain ones were prosecuted on a separate indictment. It was alleged in this indictment that the stock of Coronado Gold Mines, Inc., was sold on misrepresentations that the company was producing gold and earning money; that the price of the stock on the New York Mining Exchange was manipulated through wash sales; and that thereafter the Coronado stockholders were reloaded with the stock of Kelly Gold & Silver Mines, Inc., on misrepresentations that that company also was earning money.

The extensive trial below was necessarily devoted largely to testimony as to the organization of the two gold mine companies

and what they did towards acquiring and developing gold mines, and the manner and means by which their stock was pressed into the hands of the general public. On this appeal it is virtually conceded that the stock-selling scheme was fraudulent, as, indeed, the testimony abundantly demonstrated. As to the Coronado Company, it appeared that it acquired an old mine in Idaho and later leased another, neither of which produced any commercial ore, that is, ore which could be mined at a profit, or any revenue for the company. Indeed, the testimony indicated for the first mine, the only one developed at all, an average value of $2.00 to $2.50 of gold per ton, with a cost of mining and milling of at least $7 per ton, although defendant Rogers, as president of the company, was writing the stockholders of a report by "one of the country's most capable mining engineers" that the high-grade ore in this mine averaged from $20 to $30 per ton, and that some ore was found which had run as high as $400 and $500 per ton. A large block of the Coronado stock was acquired by Bankers Service Corporation, a corporation owned by the defendant Morse, and was by it distributed to the public by high pressure salesmanship, at prices which netted $158,000 profit after taking out commissions and paying the cost price. Meanwhile a show of an active market was made by extensive wash sales and market manipulation on the New York Mining Exchange. Thereafter the Kelly Company was organized and its stock offered for sale to the Coronado stockholders. The Kelly Company acquired a mine in California, which it operated for about a year at a loss in excess of $85,000—money obtained from stock sales and loans, including a large stock purchase by, and a loan from, Coronado—although it was represented, by defendant Wiseman in selling its stock, to be making money, and in fact declared nine monthly dividends.

Without attempting to attack the cumulative weight of this evidence, defendants seek either to show errors in law at the trial or to disassociate themselves from the scheme, at least at the time of the crimes specifically charged in the indictment. Thus, they contend that the offense is barred by the statute of limitations, because the scheme to defraud terminated more than three years before May 24, 1938, the day the indictment was returned. 18 U.S. C.A. § 582. It is also urged, on behalf of the defendant Bob, that he had withdrawn from the scheme prior to the end of the three-year period on May 24, 1935.

We think there is ample evidence to support the jury's conclusions both that the scheme as a whole continued, and that Bob was actively connected with it, after May 24, 1935. Without attempting to rehearse all the testimony, it may be pointed out that at least two sales of Kelly stock were shown to have been made on or after that date, that stock of the Kelly Company was issued thereafter, that there remained to be disposed of 350,843 out of a total of 500,000 shares of Kelly stock, and that the conspiracy, previously proven by ample evidence, had not then been fully consummated. In addition, there was testimony that in August, 1935, Bob directed a settlement of claims made by the defendant Wiseman, who had threatened to go to the district attorney and who then agreed to "coöperate," and also testimony by Fennessy, president of the Kelly Company and named as a co-conspirator, that in December, 1935, he and Bob asked one of the stockholders to use his influence with a stockholders' committee then becoming active in that company to get the committee to defer action until the Reconstruction Finance Corporation had given a definite reply on a loan application made by the company in May, 1935. This evidence is ample to show that the scheme to defraud continued within the period of limitation. United States v. Rollnick, 2 Cir., 91 F.2d 911, 918.

This evidence also rebuts Bob's assertions that he had completely withdrawn from the scheme, as he claims, in the latter part of 1934 or early in 1935. The prosecution had claimed that he was the principal figure and directing genius of the conspiracy, although he remained in the background; and the evidence had shown his direction of the whole operation, including the original purchase of the gold mines, with title taken in the name of his office associate, and the conduct of the companies, even though he did not appear as either stockholder or officer of them. On this evidence the jury well might hold that his claimed withdrawal, like his earlier conduct in remaining in the background, was a device to throw the investigating federal authorities off the trail, rather than to sever his relation with the scheme completely.

Error is alleged in the admission of the testimony of Griffin, one time attorney for Bob and for the mining companies. Griffin testified at length for the Govern-

ment, showing Bob's control of the operations of the mining companies. This is claimed to violate the privilege between attorney and client. But Griffin's testimony related to conversations and communications with Bob during the commission and in furtherance of the crime charged in the indictment, and was, therefore, not privileged. United States v. De Vasto, 2 Cir., 52 F.2d 26, 30, 78 A.L.R. 36, certiorari denied, 284 U.S. 678, 52 S.Ct. 138, 76 L.Ed. 573; Fuston v. United States, 9 Cir., 22 F.2d 66, 67; Clark v. United States, 289 U.S. 1, 15, 53 S.Ct. 465, 77 L.Ed. 993. It has always been settled that communications from a client to an attorney about a crime or fraud to be committed are not privileged. Regina v. Cox, 14 Q.B.D. 153; Wigmore on Evidence, 2d Ed., § 2298; 1 Thornton on Attorneys, 212-215. There must, of course, be first established a prima facie case; the mere assertion of an intended crime or fraud is not enough to release the attorney. O'Rourke v. Darbishire, [1920] A.C. 581, 604, 623. But here such a case had already been established against Bob through Israel, named as a co-conspirator, who testified before Griffin took the stand as to details of the stock-selling campaign. The commission of the crime by Bob was not proved by Griffin's testimony alone, although there is no doubt of its extensive and damaging character. The subsequent testimony of Fennessy also showed Bob's close connection with the scheme.

█ It is further urged that error was committed in admitting certain letters between Royer, an engineer in charge of operations at the Kelly mine, and Gibson, who had sold the Kelly mine to the Kelly Company and was a Kelly stockholder because of stock received in payment for the mine. The objection to the letters is based on the ground that they contain conclusions or hearsay opinions prejudicial to the defendants. Since Gibson had an interest in the Kelly mine, Royer as engineer in charge might well report to him in the course of his duties. The letters do not seem to have been wholly of that sort, however, but rather friendly exchanges by Royer, although this cannot be determined fully because we have not before us Gibson's letters to which Royer's were in answer. At any rate with a single possible exception there was nothing seriously prejudicial to these defendants in the letters.

In one letter, however, Royer went further and said, among other things, that the Coronado scheme had been investigated and the stock found to be what they called "hot," but "they" got under the wire by making the favorable Kelly deal. When this letter was introduced, it was agreed by counsel that certain unspecified portions of it were to be excluded from evidence, and we may properly conclude that the part to be excluded was that which was prejudicial. Further, all this had been shown by other precise and convincing testimony, and these hearsay observations of the engineer could do little to add to or change that picture. In view of these circumstances, we can find no such clear and damaging error in these letters as would justify a reversal of the judgment of conviction.

Other claimed errors as to admission of evidence are unsubstantial. One of these particularly so was based on a series of objections, including a motion for a mistrial, because several witnesses in describing those present at a meeting referred by name to a person not otherwise identified in the evidence who, it is now claimed, may have been known to the jury as the notorious person he is said to be in fact.

█ We are also of the opinion that the evidence implicating the defendant Rogers is sufficient. He took the stand in an effort to show that, although he was president of the Coronado Company and secretary and treasurer of the Kelly Company, he had acted in good faith throughout. Admittedly he had sent letters to stockholders of the kind cited above, which he knew contained false and misleading statements. But he said that he had subsequently ordered these letters destroyed, and not mailed. Nevertheless they were mailed and the jury was not bound to believe Rogers' excuse or to credit his other testimony. One who shows himself as an officer in companies promoting such a stock-selling fraud as was here disclosed can hardly object when the jury holds him an active participant in it.

█ Finally the defendants take exceptions to parts of the court's charge, particularly to expressions of opinion as to certain portions of the evidence. Such comments on the evidence are permissible, provided the jury understands that they are based on the court's own recollection of the testimony, and, further, that such recollection and the court's opinion of the evidence are not binding on the jury. United States v. Dilliard, 2 Cir., 101 F.2d 829, 836, certiorari denied, 59 S.Ct. 484, 83 L.Ed. 1036. The court had a clear conception of the case

based on the evidence, and this it presented to the jury. It did present also the defendants' claims, which consisted, in the main, of denials, though it indicated its own opinion of the nature of these denials. It then charged that the jury was the sole judge of the facts and credibility of the witnesses, and that if the jury found that the facts had been misquoted or misstated by the court, it must abide by its own recollection. Possibly, as the defendants claim, this alone was not adequate, because the court had stated not merely facts, but inferences or opinions as to what had happened, drawn from these facts. It should have been made clear that the jury was to form its own opinion and make its own inferences of fact and need not accept those presented by the court.

Whether or not the original charge was adequate in this regard, the point was thoroughly covered by the court, in response to specific objections by defendants after the charge had been given. Then the court informed the jury no less than six times specifically that the expressions referred to were merely the court's opinion or its recollection of the testimony, saying, "I never intended to do anything more than merely express my opinion of the evidence," or again, "I, of course, leave that entirely to the jury." The court thus made it abundantly clear that not merely recollection of the testimony, but also opinions or conclusions concerning it, were ultimately the province of the jury. The jury could not have failed to understand admonitions so direct as were these. There was no reversible error in the charge.

Affirmed.