## UNITED STATES v. GOLDSTEIN et al.

### No. 263.

Circuit Court of Appeals, Second Circuit.
June 2, 1941.

---

Theodore Kiendl and Schwartz & Frohlich, all of New York City (Arthur H. Schwartz, of New York City, on the brief), for Goldstein.

Lester R. Bachner and Koenig & Bachner, all of New York City, for Schwartz.

Benjamin Kronenberg, of New York City, for Elentuch.

Sidney J. Loeb, of New York City, for Rubin.

Maxwell S. McKnight and Mathias F. Correa, U. S. Atty., both of New York City, for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

These are appeals from convictions for a scheme to defraud—together with a conspiracy to commit the same crime. The scheme was the same as that which was before us in United States v. Weiss, 2 Cir., 103 F.2d 348; but the convictions which we then affirmed were under another indictment and all of the accused except Goldstein were different from those now at bar. The Supreme Court reversed these convictions (Weiss v. United States, 308 U.S. 321, 60 S.Ct. 269, 84 L.Ed. 298) because of the admission of certain "wire taps," and when the case went back for a new trial, a preliminary hearing was had, following the practice prescribed in Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307. Before any decision had been made upon the evidence taken at this hearing, J. J. Weiss, one of the accused, pleaded guilty; thereupon the prosecution proceeded under the present indictment, which was then pending, and abandoned the "Weiss" indictment. The evidence already taken was by agreement admitted in a similar preliminary hearing begun under this indictment, at the end of which the judge decided that the prosecution should be allowed to call as witnesses two of the prime movers in the scheme, Messman and Garrow, overruling the objection that they had been induced to turn state's evidence by means of records obtained by "tapping" their wires. One of the seven accused pleaded guilty during the trial, but the other six went through to verdict, and the appellants are four of these. The important points raised are (1) that the testimony of Messman and Garrow was procured by "taps," (2) that it did not also appear that the "taps" had not served as clues leading to other evidence which had been introduced, (3) that the judge's charge was not impartial, and (4) that the evidence did not support the verdict.

In order to decide how far the use of the "taps" should have prevented the calling of Messman and Garrow, we must go back to the original discovery of the frauds. Sometime before August, 1936, a number of large insurance companies, suspecting that they were being victimized, retained two firms of lawyers to run down the culprits. One Bernstein was a member of one of these firms, and in that month a man named Kipnis came to him and made an oral confession which laid bare the outlines of the whole scheme. Kipnis had been one of the insured who had fraudulently collected upon a disability policy, and he had helped a number of others to commit similar frauds. The plan involved the insured's taking digitalis or some similar drug which would make his heart's action simulate disease, and this, together with a proper paraphernalia of cardiograms, hospital records and declarations of symptoms, was enough to evade detection by the insurers. To the success of such a scheme a confederation of lawyers, doctors—including heart specialists—and of course the insured themselves, was necessary. Kipnis inculpated Weiss and Garrow, lawyers, Messman and Gold-

stein, doctors, and a great many others. His story to Bernstein, as Bernstein gave it, if believed, made a complete case, but obviously he would not be believed unless thoroughly corroborated; and Bernstein set out to procure the necessary corroboration. He instructed Kipnis to keep up a front of continued participation in the scheme and he installed in Kipnis's offices a dictaphone which would record talks with visitors. Besides this, he got records of telephone talks between Kipnis and his confederates, by means of an extension receiver at which a stenographer was placed; no machine was interposed in the circuit during this period. Matters went along in this way through August and September, Kipnis meanwhile disclosing to Bernstein numerous fabricated "case histories" of fraudulent claimants. On October 8, 1936, Kipnis made a detailed and lengthy written confession which implicated Weiss, Garrow, Messman, Goldstein and a great many others, and which, along with his other material, Bernstein shortly thereafter presented to Hardy, the district attorney, who on November 27th, called in a post-office inspector, Shea, to work up the case. On December 6, Shea, without any independent investigation of his own, turned in a report to Hardy in which he declared that there was ground for the indictment of 75 or more persons. Towards the end of January, 1937, Hardy had a conference with Bernstein and the other insurance lawyers at which they decided to begin the regular "tapping" of the wires of the principals in the scheme by introducing recording machines into the circuits; and this went on with some interruptions from that time until the arrest of Messman and Garrow on May 18, 1937, and even later. By these means nearly a thousand records were procured of talks between the confederates, in none of which, however, did any of the appellants at bar take part. The prosecution introduced none of these records in evidence, and they could therefore have contributed to the convictions only in two ways: they might have contained clues leading to the discovery of some of the evidence actually introduced; and they might have served in whole or in part to induce Messman and Garrow to turn state's evidence and become the chief witnesses at the trial. The prosecution denied that they were useful as clues, or that they had helped in any way except as confirmation of information which it already had. The record contains nothing to contradict the testimony of those gentlemen who had prepared the case and who swore that Kipnis's confession, the cardiograms, the insurance files and the hospital records were the sources of all their information. We should not therefore have been justified in sustaining a finding that the "taps" had served as clues, even if one had been made and if the prosecution had the burden of proof upon the issue.

■ There remains the question whether the "taps" served to break down either Messman or Garrow and turn them into informers. The testimony of each was so vital to the case that the convictions cannot survive if the prosecution should not have been permitted to call either. Both these men were arrested on May 18, 1937, and Messman was taken at once to the district attorney's office where an assistant examined him. The assistant told him that his telephone and "all these lawyers' telephones" had been "watched"; that he might hear his own voice if he chose; that the prosecution would like to know whether he would tell everything or "play ball" with the accused; and that it knew what was going on and was not "stabbing in the dark." As he did not then break down he was put into the same cell with one, Nelson, another of the confederates, who told him and still another, Gross, that the prosecution had gathered together "an awful lot of evidence" including telephone records in which he, Nelson, had heard a talk of his own with Weiss. There was "too much dirt against us. The government has got everything." After hearing this from Nelson Messman was on the same day taken back to the assistant's room where he confessed. On the preliminary hearing he denied that the telephone record had had anything to do with his breakdown; he said that he had seen the net gathering about him for some months before his arrest, had decided that his only chance was to plead guilty, turn informer, make what terms he could with the prosecution, and, as to his sentence, to rely upon the help he could give to convict the others. He confessed that he was abandoned in morals, ready to do anything that would serve his turn, and showed himself utterly untrustworthy. It is indeed curious, if he had made up his mind to change front before he was arrested, that he failed to confess when he was first before the district attorney and waited until after Nelson had dilated upon the amount of evidence which had been accumulated against him. One

would have expected that on his own story his arrest would have been enough to touch off his confession. However, if the judge had affirmatively found that the "taps" contributed nothing to this result, we should not have disturbed the finding; it is not impossible that although from the start he meant to confess, he might not have seized the first moment to do so. The difficulty is that it does not appear that the judge meant to find more than that the accused failed to prove that the "taps" had contributed to the breakdown. For this reason the issue depends upon which side had the burden of proof at the hearing.

██ The case for the accused is considerably weaker as to Garrow. He too was arrested on May 18, 1937, but he did not confess until nearly two years later. It is true that he did so only a few days after we had held in United States v. Weiss, 2 Cir., 103 F.2d 348, that it was proper to allow the introduction of the "taps," and the argument is not without plausibility that this sequence was causal. Still, he was not subjected to the same pressure as Messman, and like Messman he declared that the "taps" had not influenced him at all, though his word was, if possible, even less reliable. Again, we should not have disturbed an express finding, had there been one, and the issue, like that as to Messman, depends upon the burden of proof. Upon that question we have nothing to guide us but Nardone v. United States, supra (308 U. S. 338, 60 S.Ct. 266, 84 L.Ed. 307) and that did not actually decide the question. It is true that Mr. Justice Frankfurter did say (308 U.S. page 341, 60 S.Ct. page 268, 84 L.Ed. 307) that the accused had the burden of proving that the prosecution "tapped" the wires, and that if he did, the judge must give him a fair opportunity to show how far the "taps" had infiltrated into the case. He added, however, that after this had been done it would leave "ample opportunity to the Government to convince the trial court that its proof had an independent origin." That language cannot indeed serve as a ruling that the prosecution has the burden to show how far its proof has "an independent origin," but it is consonant with that position, and to some extent suggests it. In any event it appears to us that this should be the rule in analogy to the well settled doctrine in civil cases that a wrongdoer who has mingled the consequences of lawful and unlawful conduct, has the burden of disentangling them and must bear the prejudice of his failure to do so; that is, that it is unfair to throw upon the innocent party the duty of unravelling the skein which the guilty party has snarled. To impose the duty upon the prosecution is particularly appropriate here, for it necessarily has full knowledge of just how its case has been prepared; given a prima facie case against it, i. e., "taps" and some use of them, it should do the rest. It is true that the tendency has of late been to mollify the extreme of this requirement, substituting the best honest guess for a quantitative allocation when that is obviously impossible, so that the victim shall not get what cannot possibly be his. Sheldon v. Metro-Goldwyn Pictures Corp., 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825. But there has been no disposition to relax that feature of the doctrine which resolves all possible doubts against the wrongdoer. We content ourselves with citing some of those decisions which expressly state the reasoning. The Idaho, 93 U.S. 575, 585, 586, 23 L.Ed. 978; Schnell v. The Vallescura, 293 U.S. 296, 306, 307, 55 S.Ct. 194, 79 L.Ed. 373; Brainard v. Cohn, 9 Cir., 8 F.2d 13, 15; United States v. Federal Mail Order Corp., 2 Cir., 47 F.2d 164, 165; Samson v. Rose, 65 N.Y. 411, 421; Wellock v. Cowan, 246 Mich. 45, 224 N.W. 413. We hold therefore that, after the accused had proved that the "taps" had been made and had to some extent been used to break down Messman and to a less degree Garrow, the burden fell upon the prosecution to satisfy the district judge that they had no part, or no substantial part, in that result. This being true, and the condition of the findings and the evidence being what we have described above, we hold that, as the record stands, the judge should have forbidden the prosecution to call Messman, and probably Garrow as well, though as to him we need make no finding. In so deciding we assume that the accused were entitled to invoke the protection of § 605, 47 U.S.C.A., and that assumption we shall now consider.

The authorities on that question are very few. In United States v. Seeman, 2 Cir., 115 F.2d 371, 374, we expressly held that § 605 merely conferred a privilege personal to the "sender," though we had without discussion decided the opposite once before. United States v. Bernava, 2 Cir., 95 F.2d 310. Our own decisions are not however important if the Supreme Court has ruled otherwise; and the question is how far the reversal, even as to Goldstein, in Weiss v.

United States, supra (308 U.S. 321, 60 S. Ct. 269, 84 L.Ed. 298), must be taken as a holding the opposite of our ruling in United States v. Seeman, supra. Although, as we have said, Goldstein's wires had never been "tapped," Weiss's had been repeatedly; and there were three records of talks in which Gross had had a part and three in which Krupp had. As to Weiss it therefore was clearly necessary to decide the chief point which the court discussed; i. e. whether the statute applied to intrastate messages. As to him it was necessary to discuss the second point also—the validity of Messman's consent. All this was likewise true of the records of the talks with Gross and Krupp. As to Goldstein alone did the decisions of these questions therefore become immaterial, assuming that § 605 is limited to a personal privilege of the "sender." This made it very natural for a court to disregard that point even though, as was the case, the prosecution raised it in its brief. Strictly it would indeed have been still possible to affirm Goldstein's conviction and reverse the others', but the result would have been extremely harsh. It would have presupposed that a fair trial of the others could have been had, though the forbidden records were actually introduced in evidence provided that the jury had been admonished to use them only against Goldstein. Such an admonition would have been practically valueless in a case like this, and the court might well have refused to affirm Goldstein's conviction when, if the trial had been fairly conducted throughout, the records would not have gone into evidence at all. It is indeed always a matter of the greatest delicacy to say that the decision of a superior court is not to be taken as authoritative upon a point not discussed; yet there are occasions when unless we do so, we shut our eyes to the fact that in every probability it was not decided at all. It seems to us that this is such an occasion, and that the matter is open.

Our reasons for thinking that if it is open, the convictions may stand are as follows. It is well settled that, although the victim of a search, unlawful under the Fourth Amendment, has a privilege to exclude any evidence against him procured in its course, the privilege is personal to him, and that no one else can avail himself of the violation, however scandalous that may have been. In Connolly v. Medalie, 2 Cir., 58 F.2d 629, we so decided and collected the cases up to that time which were very numerous and unanimous; and there has been no divergence since that time. Although the Supreme Court has never expressly passed upon that question, it has dealt with the privilege against self crimination under the Fifth Amendment in the same way. Hale v. Henkel, 201 U.S. 43, 69, 70, 26 S.Ct. 370, 50 L.Ed. 652. It is true that these privileges are considered as in part sanctions against the violation of the Constitution—being, in the case of searches, additional to the criminal sanctions imposed by statute (§§ 53a, 630 and 631, Title 18 U.S.C.A.) and it is also true that they could have been made still stronger by forbidding the use of the evidence against everyone. Immunity was not carried so far; it was thought enough if only the injured person is protected. This was in accord with the law of privileged communications generally, for the communication is not itself privileged, only its disclosure. An eavesdropper, or a secreted dictaphone, may record and repeat whatever is said, whether the communication be between attorney and client (Rex v. Simons, 6 C. & P. 540; State v. Center, 35 Vt. 378, 382, 386; Hoy v. Morris, 13 Gray, Mass., 519, 74 Am.Dec. 650), between spouses (Commonwealth v. Wakelin, 230 Mass. 567, 574, 120 N.E. 209; Knight v. State, 114 Ga. 48, 39 S.E. 928, 88 Am. St.Rep. 17; Commonwealth v. Everson, 123 Ky. 330, 96 S.W. 460, 124 Am.St.Rep. 365) or between physician and patient (Springer v. Byram, 137 Ind. 15, 36 N.E. 361, 23 L. R.A. 244, 45 Am.St.Rep. 159). Furthermore, if a witness who should claim the privilege fails to do so, his testimony is competent and its admission is not an error of which a third party may complain. Wigmore § 2196. True, when the witness does claim the privilege and it is erroneously overruled, apparently a majority of courts make the error available to third parties, but there can be no doubt that Professor Wigmore is right in holding with the minority, unless the third party shares that interest which alone justifies suppression of the truth.

So far therefore as § 605 conferred a personal privilege on the "sender," there can be no doubt, it seems to us, that he alone can invoke it. It plainly does confer such a privilege, for the "sender" may consent to the divulgence of the message after it has been unlawfully intercepted. (The discussion of the second point in Weiss v. United States, supra (308 U.S. 321, 60 S.Ct. 269, 271, 84 L.Ed. 298) presupposed exactly that; and it necessarily follows from the "sender's" privilege to divulge messages which have not been intercepted at all.)

The question thus comes down to whether, when the "sender" has not consented, a third party may vicariously invoke the prohibition for his own protection. In form the language is indeed imperative: "no person not being authorized by the sender shall intercept * * * and divulge or publish" the message; moreover § 501 makes divulgence a crime. In this respect § 605 is therefore unlike those statutes which punish an unlawful search, but which do not punish the use of the evidence procured. Yet, although there cannot for this reason be any question that only the consent of the "sender" will condone the divulgence of an intercepted message, it does not follow that anyone else can complain of the wrong. Certainly "senders" alone are within the protected class (if it were not so, their consent would not excuse divulgence) and the purpose could not have been more than to protect the secrecy of their talks. For example, nobody but a "sender" could sue civilly for a violation of the section. St. Louis & San Francisco R. R. Co. v. Conarty, 238 U.S. 243, 35 S.Ct. 785, 59 L.Ed. 1290; Lang v. New York Central R. R. Co., 255 U.S. 455, 41 S.Ct. 381, 65 L.Ed. 729; Gorris v. Scott, L.R. 9 Ex. 125; Boronkay v. Robinson & Carpenter, 247 N.Y. 365, 160 N.E. 400; Restatement of Torts § 286. Nor can it be urged as a distinction that that doctrine is limited to cases where a party seeks affirmative relief for a violation of the statute; for that is what the accused at bar are seeking. The proscribed evidence, taken by itself, is entirely competent, and could be produced but for its wrongful acquisition; the accused must persuade the court to forbid its use; they ask a remedy for a wrong done to them and they must have some standing to complain. They have no standing unless they can show an interest which will be invaded by the divulgence and which the law will recognize. They do indeed have an interest which is invaded, but it is not one that the law will recognize. It is nothing better than that evidence, which shows them to have committed a crime, shall be suppressed because they are deeply interested in not being punished for that crime. If they were defendants in an equity suit, they might succeed, for a defendant in equity need not be the victim of the wrong which disqualifies the plaintiff to seek an equitable remedy, provided it is closely enough interwoven with the legal transaction involved in the suit. But, so far as we know, there is no doctrine that a criminal prosecution can be defeated by showing that the prosecutors must commit a wrong—civil or criminal—to prove their case. Such considerations are relevant indeed between them and their superiors, but these the accused does not vicariously represent. Indeed, in this particular application of such a doctrine if it existed, the curious result would be that the event would turn upon which side succeeded in securing the favor of the "sender"—a person who might very well have no interest of his own in the divulgence of the message.

Finally, whatever may be thought of the foregoing, it so chances that in the case at bar the convictions can stand even if the section does so peremptorily forbid divulgence of a message that anyone can take advantage of its violation. This is so because the section prohibits only the divulging of the message, not its use after it has been divulged, and in the case at bar no message was divulged upon the trial. The prosecution had indeed committed a crime earlier, and by hypothesis the evidence it introduced was the fruit of that crime; but that was all in the past and before the trial came on; no further violation of the section was then necessary. We of course do not forget that it is precisely the use of evidence obtained by such divulgence that Nardone v. United States, supra (308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307) condemned, but the distinction between divulgence of the message by the very act of introducing it, and introducing evidence acquired by past divulgence, is nevertheless critical. For the only possible escape from those authorities which limit to the victim of an unlawful search the objection to evidence procured by the search, lies in the fact that § 605 expressly forbids divulgence as well as acquisition—"interception"— while the Fourth Amendment and its implementing statutes forbid only acquisition. When therefore as here the question arises of evidence procured by an earlier unlawful divulgence the parallel between the situation and that of an unlawful search becomes perfect; and it would be a curious result, if a violation of the section were more sweepingly condemned than a violation of the Constitution. Aside from the difference in authority between the two, the wrongs involved are so different in their heinousness: an unlawful search may be the invasion of the home itself, an outrage which no people will endure which still dares call itself free; the interception of a telephone

message, enraging as it is, is not worse than other violations of secrecy which the law countenances.

■ The only other point which needs extended discussion is the judge's charge. This was long and detailed; he repeatedly advised the jury that they were not to take as authoritative any opinions he might venture as to the facts. He then put before them a number of questions whose answers they might, he thought, find important or even critical in deciding the guilt or innocence of the accused. These he did indeed couch in such a way as to make fairly apparent what answers he would himself have given to them; and it must be owned that the answers were damaging. The questions were, however, the sum of all that could be thought to invade the jury's province, and they occurred in a long charge, prefaced by overabundant caution, as we have said. The situation was thus quite different from that in United States v. Murdock, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381—the last pronouncement of the Supreme Court—in which by a divided vote it affirmed the reversal of a conviction in which the judge had told the jury that the prosecution had "proved that this defendant is guilty in manner and form as charged beyond a reasonable doubt." 290 U.S. page 393, 54 S.Ct. page 225, 78 L.Ed. 381. Such an unequivocal declaration upon the very issue had an impact immensely more persuasive than the oblique intimations to be drawn from the questions put to the jury here. The judge did not "distort * * * or add to" the evidence; what he did do was to "comment in order to give appropriate assistance" to the jury. Quercia v. United States, 289 U.S. 466, 470, 53 S.Ct. 698, 699, 77 L.Ed. 1321. Nor is it true that he presented the evidence unfairly. In such cases it is seldom possible to say more in the accused's favor than that he denies any complicity with the chief participants in the scheme; the real question is how far the prosecution has succeeded in enmeshing him in a web of circumstance strong enough to withstand those denials. While the judge might have pointed out possible holes in that web, "fairness" does not mean neutrality; he was in some measure responsible for the result, and his conclusions—though he really told them none—if presented, without heat or bias were a proper guide to the jury. (The belief very commonly held by judges that a jury is excessively subject to the judge's influence,

my own experience at least did not bear out. I found them generally quite robust enough to form their own opinions independently of any indications I might give them of mine.) In our decisions we have repeatedly gone farther than the judge did here. Safford v. United States, 2 Cir., 252 F. 471; Dillon v. United States, 2 Cir., 279 F. 639 (this decision was probably overruled by United States v. Murdock, supra); United States v. Frankel, 2 Cir., 65 F.2d 285, 288; United States v. Dilliard, 2 Cir., 101 F.2d 829, 835; United States v. Bob, 2 Cir., 106 F.2d 37, 41, 125 A.L.R. 502.

■■ Some of the accused argue that there was no "credible" evidence to sustain the verdict; upon the theory that the testimony of Messman and Garrow was not enough. But the credibility of even such witnesses as they is for the jury; whether their testimony should satisfy all reasonable doubts is not a matter which the courts will review. In the case at bar nobody disputes that a number of persons did actually engage in a wide scheme to defraud the insurance companies; or that all the accused were associated in one way or another with those who concocted it. Whether that was a guilty or an innocent association was the only question left open, and the testimony was ample that it was a guilty one, if the jury chose to believe the witnesses.

■ As to Elentuch, he was shown to have been active in the conspiracy at least as late as December, 1936, and he did not prove that his connection ended before his first confession which was in July, 1937. The present indictment was filed in March, 1940, and was therefore in season, regardless of the first indictment which it superseded. United States v. Strewl, 2 Cir., 99 F.2d 474, 477.

■ Finally, we cannot say that on the preliminary hearing the judge unduly limited examination by the accused. It is extremely difficult to glean from the record just what limits he did draw, and how far the accused meant to complain when he drew any. The Supreme Court in Nardone v. United States, supra, 308 U.S. 338, 341, 342, 60 S.Ct. 266, 84 L.Ed. 307, clearly meant that the existence of "taps" should not become an excuse for the exposure before trial of all the prosecution's evidence. As in cases of discovery, criminating evidence, or the theft of trade secrets, there is always theoretically a contradiction in inquiring into the existence of facts the propriety of whose disclosure can strictly

be determined only after they are known. For such situations there is no vade mecum and the judge must feel his way; he need not allow the same searching cross examination that is ordinarily the privilege of the inquiring party. In the case at bar the judge did indeed express himself once or twice in a way that seemed to restrict the examination unduly; but taking his rulings in bulk together with the accused's complaisance we cannot say that he held them on too tight a rein. Besides, in the view we take this point is obviously immaterial for two reasons: the prosecution was not shown to have carried its burden of proving how far the "taps" contributed to Messman's or Garrow's breakdown; and the accused had in any event no standing to prevent the calling of either at the trial.

The other errors alleged require no mention.

Convictions affirmed.