## UNITED STATES v. SIEBRICHT et al.
### No. 157.

Circuit Court of Appeals, Second Circuit.
June 13, 1932.

See, also, 44 F.(2d) 824.

Peters & Burchell, of Brooklyn, N. Y. (Arthur L. Burchell, of Brooklyn, N. Y., of counsel), for appellant William H. Siebricht, Jr.

Frank Cohan, of New York City (Charles H. Tuttle, Frank Cohan, and Thomas E. Kerwin, all of New York City, of counsel), for appellants Frank Pallante, Arthur R. Illing, William H. Nast, Louis J. Klovrza, and Herman F. Plump.

Joseph Lonardo, of Long Island City, N. Y., for appellant Albert F. Graff.

Howard W. Ameli, U. S. Atty., of Brooklyn, N. Y. (Herbert H. Kellogg, Henry G. Singer, and Emanuel Bublick, all of Brooklyn, N. Y., of counsel), for the United States.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The eleven defendants herein were directors of Long Island National Bank and were indicted for conspiring to misapply funds of the bank in contravention of section 592 of title 12 of the United States Code (12 USCA § 592). Of these, Allen, Wagner, and Ongaro were granted a severance and allowed to plead guilty to other charges and the other eight were tried and convicted. One of the eight, Julius Link, received a suspended sentence, and did not appeal. The remaining seven were convicted, and have taken this appeal from the judgment of conviction.

The indictment is a bungling instrument, but it purports to charge that the defendants

conspired to misapply the funds of the bank by agreeing to cause the latter to pay moneys for real estate in excess of the actual cost with the intent that such excess should be misapplied and converted to the use of the defendants.

It is alleged in substance that as a part of the conspiracy Julius Link should purchase No. 3701 Grand avenue, Astoria, which the bank then occupied under a lease, for the sum of $117,500; that upon the completion of this purchase the premises would become the property of the bank; that thereupon the title should be conveyed by Link to the bank through a dummy for $34,172.38 in excess of the price paid by Link to the original owner; and that this excess should be divided among the defendants and converted to their own use. It is further alleged that it was a part of the conspiracy that Link should also purchase for the bank an adjoining lot of land for $53,750, transfer the title to the bank at $60,500, and that the defendants should convert the difference between these two sums, amounting to $6,750, to their own use.

There was ample evidence that the defendants arranged to have Link purchase the first parcel, that he obtained it at a cost of $117,500, and that the bank thereafter took title through a dummy at an advance of $34,-172.38 which was divided among the directors. The principal defense on the merits was that the defendants believed Link had purchased No. 3701 Grand avenue on his own account, had turned it over to the bank at a profit, and was generous enough to divide this profit among his fellow directors. The jury evidently regarded this defense as fallacious, and adopted the government's theory that in the purchase Link acted as agent for the bank, that upon the purchase the property in equity belonged to the bank, and the $34,172.-38, divided among the defendants after he had conveyed title to the bank through the dummy, were corporate assets which they converted.

There was in the same way ample evidence that the second transaction was carried out as proposed, and that the excess of $6,750 over cost was misapplied by placing it to the credit of a "pool," of which the defendants were members.

The difficulty with the government's case is that the indictment charges a single conspiracy involving both of the purchases of real estate, and that the proof indicates two conspiracies. It may well be that a conspiracy to defraud may be broad enough to embrace the employment of various ways and means or agencies not specifically in mind when the conspiracy originated. This the proof in a mail fraud case often shows. Wilson v. United States (C. C. A.) 190 F. 427. But there is not the slightest evidence that, when Link was designated to purchase the first lot for the bank and he contracted to buy it on June 1, 1927, a second purchase was contemplated by any one. Though the making of the contract of purchase by Link on June 1, 1927, is set forth in the indictment as the first overt act of the conspiracy, the government may say that it proved a general scheme to misapply assets of the bank which originated about October 1, when Link took title and paid the purchase price by notes of some of the directors discounted by the bank, for about this time, on October 5, the dummy received a conveyance from Link, and on October 11, the board of directors of the bank voted to buy the property for a sum which involved the payment of $34,172.38 over the real cost. In other words, the government may contend that, though it failed to show that the conspiracy was formed about June 1, it did prove an arrangement to misapply assets of the bank under the disguise of a purchase from Link, or his dummy, originating at a time so near the making of the contract to purchase the second parcel that a jury might infer that both transactions were part of a single plan.

But there is no evidence either that, when Link contracted for the first lot, or when the conveyance through a dummy at an advance price was arranged in October, the directors had in mind the purchase of the second lot through Link or the addition of $6,750 to the price he was to pay, or the misappropriation of that sum. The first evidence of any plan to purchase another lot appears in the minutes of the directors' meeting of November 9, 1927, when the second purchase was discussed and authorized at a price not to exceed $61,-000. The negotiation for this purchase was not taken up with the owner until November 21, the contract was not entered into by Link until November 28, and the sale was not completed until a month later. It is nothing but guesswork to say that the second purchase was contemplated when the first was undertaken or that the two transactions were part of a general plan. Indeed it seems more likely that the officers of the bank decided to add to the land for its site after the plot which it was occupying had been acquired, and when they had reached this conclusion formed a plan to misappropriate further assets in a way which had proved lucrative in the case of the first parcel.

The first scheme to misapply assets originated either about June 1 or about October 1, and was completed by the division of the spoils on October 18, except perhaps as to Graff's share, which he said he did not get until November 11. On that date at the latest the first scheme had ended. It is doubtful whether the delay in giving Graff his share of the $34,172.38 extended the life of the conspiracy, for this entire sum had already been misappropriated on October 18, and Graff's share had been placed in an envelop for him, so that mere delay in delivering it did not further the objects of the conspiracy. Certainly the subsequent payments on November 18 and 19 of taxes and mortgage interest apportioned against the bank's own property cannot be regarded as acts in furtherance of the conspiracy which extended its life. Lonabaugh v. United States (C. C. A.) 179 F. 476. The bank had been allowed by the vendor the pro rata amount of these items which had accrued at the time of closing title. It was therefore only paying items of taxes and mortgage interest due upon its own property (fols. 2445–53). Moreover these payments were not from the $34,172.38 which had been divided before they were made.

The second scheme was not designed until three weeks after the first had actually ended. The first, if a separate conspiracy, was barred by the three-year statute of limitations when the indictment was found on November 13, 1930. This is true whether it ended on October 18 or November 11, 1927. Its expiring life could not be revived by the breath of a new and different conspiracy entered into (even if we fix the origin of the first conspiracy as late as October 1) some five or six weeks later.

Thus we have proof of two conspiracies under an indictment alleging a single one, and a conviction for both when the first was barred by the statute of limitations.

■ There was, we are persuaded, a failure of proof of the single conspiracy alleged, which amounted to a fatal variance. Tinsley v. United States (C. C. A.) 43 F.(2d) 890; United States v. Wills (C. C. A.) 36 F.(2d) 855; Meyers v. United States (C. C. A.) 36 F.(2d) 859; Wyatt v. United States (C. C. A.) 23 F.(2d) 791; Terry v. United States (C. C. A.) 7 F.(2d) 28.

The court left it to the jury to find a single conspiracy, but we can discover no basis in the proof for so doing.

Even if we assume that the indictment could be read as setting forth two conspiracies which might properly be joined, the question of the guilt of the defendants for the first conspiracy could not be submitted to the jury when the cause of action on that conspiracy was barred by the statute of limitations. The trial judge submitted the case to the jury only upon the theory that it could convict if it found a single conspiracy, and stated that to find the defendants guilty with respect to the second transaction it must find there was a continuing conspiracy throughout. He also refused the request of the counsel for Siebricht that, if the jury found the two purchases of property were unrelated and that in the second transaction the defendants did not plan to misappropriate assets, there could be no conviction. Thus the court relied wholly upon a single conspiracy of which we think there was insufficient proof.

Upon the record presented we are of the opinion that the judgment of conviction must be reversed. We may add that we reach this conclusion with regret because proof of serious infractions of the banking law seems to have been ample, though the culpability of the defendants is mitigated by their restorations to the bank of their misappropriations.

The assistant in charge of the trial called the bank directors Wagner and Allen as government witnesses. In the course of the examination he asked them in substance whether they had been promised any consideration for testifying. To this they answered: "No." He also asked them whether they expected some consideration from the court, to which they replied: "Yes." It was shown by the affidavit of the assistant, after the trial, that, if they would plead guilty to the indictment and would testify in behalf of the government in other cases, it had been agreed that the United States attorney would dismiss other indictments pending against them and would recommend to the court a suspended sentence under the indictment in this case to which their pleas of guilty would be entered. Whether or not the attorney in his zeal to minimize a lack of credibility of these defendants felt justified in putting such questions and obtaining such answers on the ground that any mitigation of sentence in this case would rest with the court, there can be no doubt that they were misleading. The trial court refused to set aside the verdict because the testimony of these witnesses on the merits was of no great importance, and we are inclined to agree with him. But the conduct was reprehensible, and we regret that we cannot pass over it in silence.

The judgment of conviction is reversed.