## UNITED STATES v. WISE.

### SAME v. MOORE (two cases).
### Nos. 6845, 6853, 6863.

Circuit Court of Appeals, Seventh Circuit.
Dec. 12, 1939.

Homer Elliott, of Martinsville, Ind., W. H. Eichhorn, of Bluffton, Ind., and Harry Hibschman and Creighton S. Miller, both of Chicago, Ill., for appellants.

Val Nolan, U. S. Atty., and B. Howard Caughran and Paul A. Pfister, Asst. U. S. Attys., all of Indianapolis, Ind., for appellee.

Before EVANS, MAJOR, and KERNER, Circuit Judges.

EVANS, Circuit Judge.

These appeals challenge the conviction of the three appellants, John W. Moore, Sr., John W. Moore, Jr., and Russell E. Wise, who were charged with participating in a scheme to defraud and with the use of the mails in furtherance thereof, and with participating in a conspiracy to commit a Federal offense. Five others were also named in this indictment which contained twelve counts. Defendants, John W. Moore, Sr., and John W. Moore, Jr., were found guilty on all counts, and defendant Russell E. Wise was convicted on counts one and nine. Of the remaining defendants, two (Brown and Eikenberry) withdrew pleas of not guilty and substituted therefor, pleas of guilty; two defendants were found guilty on the first and twelfth counts; and the eighth defendant, Mrs. Trent (a sister of John W. Moore, Jr.) was granted a trial continuance because of illness. Four of the defendants who were sentenced have not appealed.

The most insistently assigned ground for reversal is the insufficiency of the evidence to support the verdict. Defendants, John W. Moore, Sr. and John W. Moore, Jr., also assign error in the rulings on evidence, the alleged improper argument by the district attorney, and the court's refusal to give a requested instruction.

Briefly stated, the scheme to defraud charged in the indictment was the sale of the commercial paper of controlled (and some non-controlled) corporations, represented to be secured by warehouse receipts. The alleged fraud consisted of issuing dup-

licate warehouse receipts for the same commodity or issuing warehouse receipts which misstated the quantity of merchandise. In some instances before and after the issuance of the warehouse receipts, the merchandise therein described was converted by the defendants, Moores.

The defendant Moores, father and son, operated through the Continental Credit Corporation, which they organized. All of its stock was held by John W. Moore, Sr. and John W. Moore, Jr. (and Mrs. John W. Moore, Sr.), for which they gave a $500 bond and assigned some contracts with contemplated customers for the purchase and sale of promissory notes. They controlled or operated six companies[1] and contracted with some twelve companies[2] to purchase their promissory notes or to find purchasers therefor.

The trial was lengthy and the testimony, voluminous. Evidence there was that banks, in many instances, purchased notes which were secured by duplicate warehouse receipts; that is, two receipts covering identical merchandise. The proof conclusively established that many notes were sold secured by warehouse receipts covering merchandise which had theretofore been abstracted; and also that in other instances the merchandise represented by the warehouse receipts was not of the quality or quantity therein represented.

The Continental Credit Corporation was organized in April, 1933, and Mrs. John W. Moore, Sr. received all the stock except qualifying shares held by the defendants, John W. Moore, Sr. and John W. Moore, Jr. The corporation hired several salesmen, mostly former state bank examiners, to sell the notes of the controlled corporations, or others, to small town banks, at a 5% discount. Banks throughout Indiana, Illinois, Kentucky, Ohio, and Iowa, were sold these notes, very often single notes. There was no evidence that these notes were not paid, or renewed, at maturity, until the Spring of 1937. It was then that the affairs of the Continental Credit Corporation became serious and its precariousness, more or less known. Conditions became acute when a Fort Wayne bank refused to honor some fifty thousands of dollars of drafts against it. Moore, Sr. and Moore, Jr. were called "on the carpet" by the officers of this bank and charged with "kiting" checks. It was about this time and more noticeably later, the proceeds of notes were not turned over to makers, and gross irregularities in regard to warehouse receipts and stored merchandise were practiced in increasing volume. A receiver was appointed for the Continental Credit Corporation on June 9, 1937. Receivers were appointed for several of the controlled companies.[3]

*Sufficiency of the Evidence.* There seems to be no doubt or uncertainty as to evidence of fraud. Quite impossible is the practice of a fraud without someone's planning and executing it. Here the fraud was boldly conceived and brazenly executed. The issuance of two and even five warehouse receipts for the same commodity, the overstatement of the amount and the quality of the commodity described in the warehouse receipt, the sale of hundreds of thousands of dollars of notes secured by these false and duplicated warehouse receipts, constituted fraud of the brassy, shameless type. Practicing it on a large scale or boldly, did not change its character.

Nor is the evidence connecting the Moores with this type of fraud hardly less persuasive than the evidence of the fraud itself. True, they made no admissions, no confessions, but short of admissions, little is lacking to connect them with the conception and execution of both the fraudulent scheme and its execution.

As to the use of the mails to further it, ample evidence exists to present a jury question. We, therefore, without hesitancy or doubt, reject the assault of the two Moores upon the sufficiency of the evidence to support their conviction. Other assignments of error by the Moores have

[1] Continental Credit Corp., Indiana Warehouse Corp., Mineral Felt Co., Ehrhart Leaf Tobacco., Kim-Murph Co., and Lang Industries.

[2] Osborne & Sexton Machinery Co., Kemper Furniture Co., General Athletic Products Co., Gingrich Cash Wholesale Grocery Company, Tell City Desk Company, The Boss Washing Machine Company, Milan Furniture Manufacturing Company, The F. O. Diver Milling Company, The Bluffton Grocery Company, The Lima-Kenton Grocery Company, Indiana Flour and Feed Company, and Indianapolis Screw Products Corporation.

[3] Mineral Felt, receiver, 1937; Ehrhart Leaf Tobacco, receivership, bankruptcy; Kim-Murph Co., receivership, June 21, 1937; Lang Industries, receiver appointed Aug. 14, 1937.

been considered but need no separate discussion. They are rejected.

In reviewing, analyzing, and weighing the evidence which purports to connect defendant Wise with the fraudulent scheme and the mail's use in its furtherance, we have sought to apply the usual tests with due appreciation of the fact that a jury has found him guilty. Without going into great detail and relating the evidence which supports our assumption, we will merely say that we accept the verdict so far as the use of the mail is concerned and also assume as a verity that there existed a scheme to defraud. This narrows the inquiry to two controverted questions: Did Wise know there was a scheme to defraud? Was he a party to it?

Wise is an attorney, thirty-seven years of age. He has been a member of the same law firm since shortly after his graduation in 1924. He is president of the Union Trust Company, having previously been its director. In '33 he became associated with the Moores in the Union Mortgage Company, a reorganized company, which was to handle mortgages financed by the R. F. C. In December of '33, the R. F. C. decided not to finance the loans, and the company ceased to operate. Wise bought such stock as the Moores had held therein and still owns it.

Wise's connection with the Continental Credit Corporation was as an attorney, only. He was not hired on retainer, but occasionally, for intermittent services during 1934, 1935, and 1936. He drew some trust deeds and mortgages for the company. The Corporation retained other attorneys, one on regular retainer. Until June, 1937, he never occupied any relationship to Continental. He did not prepare the contracts the Corporation used with its customers. He had no stock or other interest in Continental.

In the latter part of March, 1937, Wise was phoned by the president of the Commercial Bank at Union City to come to a conference at the bank, and represent it. The Moores were present, and the matter involved was the Fort Wayne bank's refusal to honor drafts of the Moores. Moores' overdrafts amounted to $93,000. To help the Moores out, Mr. Ball contributed $36,000, Ex-Governor Goodrich, $8,000, Mr. Wise, $4,000, and the bank president and his two sisters agreed to guarantee $10,000 each. Wise testified that he has collected all of his contribution except $1300.

Wise was on the Finance Committee of this bank, which purchased notes through the Continental Corporation,—totalling $13,100, paying full value therefor, and which notes, secured by warehouse receipts, have never been paid.

On May 14, 1937, Wise was asked to come to the Continental's office, as attorney, to prepare a guarantee of payment by a customer of Continental, who was changing its finance company to another, to guarantee payment of notes theretofore sold by Continental. About the same time, Emerson Butts, bookkeeper of Continental, asked Wise to come in and help them straighten out their affairs, and told him there was a lot of past due paper, and that Moore, Jr. was sick. Wise told him he had plans to go away at that time, but would consult the Moores. The Moores also asked him to help. Wise told the Moores he didn't want a salary, just expenses, until he found out if he could straighten out the situation, and he also said he would only stay with the company a couple of weeks. He started work in the company's office in the middle of May, and left, June 5, 1937. While in the office, he corresponded with bank customers, supplying information furnished by Mr. Butts, the bookkeeper, and signed many form letters. He never attempted to sell any notes or dictate the company's policy, although he suggested that some of the merchandise represented by the warehouse receipts should be sold to pay the notes. On June 4, he learned of the duplicate warehouse receipts and was told by Butts there were about $60,000 to $65,000 of them. Later Butts told him they were between $162,000 and $164,000. Wise advised the Moores to tell Mr. Ball of these duplicate receipts, when they were negotiating for an advance from him.

Wise was appointed receiver for the Corporation, in a state court receivership. He later turned over the assets of the company to its trustee in bankruptcy.

It may seem almost axiomatic to say that the investigation of crimes and the detection of the guilty participants usually involve a study of motives and intent. The presence of intent calls for the existence of knowledge. Fraud, civil or criminal, is almost always practiced for gain, wherein springs the motive. To make money or to get possession of money or its equivalent usually prompts those who practice fraud and those who scheme to defraud. When a fraud is uncovered there usually follows

382

a disclosure with someone profiting out of the fraud. A few exceptions may be found where a weakling is dazzled by the possibilities or hope of political advantage or social promotion, and in such few instances, financial gain is not exacted as a price of participation.

We have searched the record in this case most diligently to ascertain what financial gain or hope of gain accrued to Wise which caused him to join the Moores in their scheme to defraud. He was not a stockholder of Continental. Nor was he its attorney. There was no financial gain to him through the consummation of the Moores' fraudulent schemes. Wise made nothing from their successful consummation. He could not and did not profit out of them. He was not even connected with Continental until the defrauding stage had passed and the efforts to liquidate and to salvage whatever was possible had commenced.

Participation in a fraudulent scheme is usually accompanied by secrecy of plans, the concealment of action. Yet Wise, before accepting a position with Continental some thirty days before the receiver was appointed, went for advice and guidance to the Indiana state banking department, the head of which believed his participation in the company would be helpful and encouraged him. He also consulted Mr. George Ball, a Moore creditor, who gave him like encouragement. Wise, when he consulted Ball, knew that he had loaned Continental officers $36,000 after he had been informed of their check-kiting. The banking department head knew at the time Wise interviewed him that Continental had past due notes outstanding which it was unable to meet.

Equally persuasive was Wise's communication with the district attorney.

When he resigned after being with Continental about four weeks and when he discovered the fraudulent practices, the issuance of duplicate warehouse receipts, etc., Wise went back to the head of the Indiana state banking department and informed him of his intention to resign and of his discovery of the duplicate warehouse receipts.

Equally persuasive to one weighing the evidence and who is somewhat familiar with the comradeship of friends who are members of the same profession in the same county, is the testimony of one Macey. Macey was an attorney, living in Wise's home county of Randolph. He represented a creditor of Continental. He testified to facts which were suggestive of friendship and confidence. He is uncontradicted, and although it appears he and Wise were friends, yet competitors in the same field, the facts and circumstances related confirm the impression that Wise acted in good faith and without criminal promptings. Wise spoke to Macey almost as one seeking advice. When first joining Continental he asked Macey not to press his claim to suit and to hold off to see whether something couldn't be done to save Continental. Macey had cooperated. As Wise was about to resign he again went to his friend, Macey, to inform him of his discoveries and of his contemplated withdrawal. Macey's reply is significant. He said if he, Wise, didn't quit, he (Macey) was going to ask a court to appoint a guardian for him.

There is, however, a vast difference between stupidity and cupidity although the latter often feeds itself fat on the former. And fortunately, looking back over mistakes which viewed from the rear seem stupid, it is nevertheless often true that eligibility to appropriate guardianship proceedings is not sufficient to establish participation in a crime where evil intent is an essential element. Particularly is the above true when the apparent stupidity arises from faith in a friend, placing trust in one whom subsequent events prove was unworthy of trust.

Because it would unduly lengthen the opinion if we separately discussed all of the transactions with which Wise was connected as manager of Continental during the thirty days he was manager, we content ourselves with expressing our conclusions.

No version of this evidence and no construction can be given to any transaction which supplies a motive for, or an intent by Wise, to defraud. And indeed strange would be a fraud where its promoter had neither a gainful incentive or an intent to assist others in illegitimate efforts at enrichment.

It seems to us that from the time Wise actively connected himself with the company in May, 1937, until he resigned as receiver and a trustee was appointed, his efforts were directed to ascertaining the facts respecting the Continental's past and present state of affairs, of endeavoring to hold back the creditors until the said facts could be ascertained. When the facts were known, he resigned. During the period of his active connection with Continental, the scheme to defraud could not have been furthered or carried out, for it was "through." It was inactive because the

banks and other purchasers of the promissory notes had become aware of the questionable financial responsibility of Continental and had become suspicious of the integrity of its past transactions and of those who conducted them.

· While impressed by the rule which makes the jury the sole judge of the facts in criminal cases and even more impressed by the fact that the trial court did not set aside the verdict, as contrary to the evidence, we are nevertheless weighted with a responsibility which must be met, namely, of examining all the evidence to ascertain where there is substantial proof of Wise's participation in the alleged scheme to defraud.

Our conclusion is that although Wise had information concerning Moores' kiting checks and of Continental's financial illness, he never learned until May, 1937, about four weeks before the receivership proceedings were instituted, and when he became manager of it, that there was any criminal misconduct on the part of those who brought it into existence and used it as an instrument to defraud. When he became manager of Continental in May, 1937, he did not know there was, or had been, any scheme to defraud and therefore could not have been a party to it. His activities could not be said to have furthered the scheme, but were directed to salvaging and liquidating the affairs of the company, the insolvency of which he became aware of only after he became connected with it.

The judgment in No. 6853 against John W. Moore, Sr. is affirmed.

The judgment in No. 6863 against John W. Moore, Jr. is affirmed.

The judgment in No. 6845 against Russell E. Wise is reversed with directions to proceed in accordance with the laws applicable in such cases.