## UNITED STATES v. BECK.

### Nos. 7344–7348.

Circuit Court of Appeals, Seventh Circuit.

March 6, 1941.

Rehearing Denied March 27, 1941.

Writ of Certiorari Denied June 2, 1941.

See 61 S.Ct. 1121, 85 L.Ed. ——.

180

Harry Fishbein, of East St. Louis, Ill., Edward K. Schwartz, of St. Louis, Mo., and Edward J. Hess and Clement J. Wall, Jr., both of Chicago, Ill., for appellants.

J. Albert Woll, U. S. Atty., and A. Bradley Eben, Asst. U. S. Atty, both of Chicago, Ill., for appellee.

Before EVANS and KERNER, Circuit Judges, and LINDLEY, District Judge.

KERNER, Circuit Judge.

This is an appeal from judgments rendered on verdicts of guilty upon an indictment consisting of 18 counts, charging in the first 17 counts a scheme to defraud and the use of the United States mails in the furtherance of the same in violation of Section 215 of the Criminal Code, 18 U.S. C.A. § 338. The last count charged that the defendants unlawfully conspired to use the United States mails in furtherance of a scheme to defraud and sets forth 134 overt acts to effect the object of the conspiracy, 18 U.S.C.A. § 88. The jury returned verdicts of guilty as to all appellants on counts 1, 16 and 18 and, in addition, found Stickney and Beck guilty on counts 2 to 17, Ross guilty on counts 6, 8, 13 and 14, Woodring guilty on counts 5 and 7, Golby guilty on count 11, Greenbaum guilty on counts 5, 7, 8, 12, 13 and 14 and Harriss guilty on count 9. The defendants were each sentenced to imprisonment for various terms. To reverse the judgments appellants separately appealed.

The scheme charged in the first count of the indictment in substance is that the appellants and their co-defendants devised a scheme to defraud, by means of certain false and fraudulent representations and promises, a certain class of persons (naming 28 persons, 22 of whom testified at the trial) owning various shares of stocks, bonds and other securities of value, by means of letters sent through the United States mails and by means of oral communications, by inducing the persons intended to be defrauded, to assign and deliver to the First Commonwealth Trustees their stocks, bonds and other securities for investment in·burial lots in Crown Hill, a cemetery in Twinsburg, Ohio.

*The facts.* In 1929 Christian W. Beck purchased 260 acres of land at Twinsburg, Ohio, and there established Crown Hill, Inc., a cemetery association, and at the same time organized Crown Hill Trust as the selling agent for Crown Hill, Inc. He had a controlling interest in each, was the chief executive, and all the other trustees took orders from him.

In 1936 Beck, Robert Stickney and Mike D. Gordon held a number of conferences and as a result Stickney and Gordon came to Chicago and established First Commonwealth Trustees to handle the sales of lots in certain sections of the cemetery for investment purposes. It was also agreed that Commonwealth would pay Crown Hill, Inc.

$57 for each lot and the lots would be sold by Commonwealth for $160 per lot; that Crown Hill Trust would cease selling lots at wholesale and would devote itself to the sale of lots for family use, and that Beck would finance Commonwealth up to $7,500. The lots to be sold by Commonwealth were in an undeveloped portion of the cemetery.

Commonwealth was established with Arthur C. McHenry and Helen B. Nichols as trustees. Before coming to Chicago Nichols had for seven years been employed by Beck with Crown Hill, Inc. Beck advised her to go to Chicago because he wanted her in charge to watch his money. Beck also directed Gordon to go to Chicago and take charge of the men. Stickney was general manager and supervised all of the operations. He rented the offices, handled all correspondence, prepared sales kits for the salesmen containing facsimile laudatory letters from Beck and Crown Hill Trust customers, and he told the salesmen that lots would be sold for $160 instead of $100, for which they had been sold in Cleveland; that the Union Standard Guaranty Company would guarantee to pay a premium of $6 per year per lot for two years for the resale privilege from the purchaser and gave them a list of names of security holders, who had made inquiries concerning Commonwealth's plan whereby the securities holders could recoup their losses. Gordon, who prior to 1936 had been employed by Crown Hill Trust in Cleveland as a salesman, was sales manager and supervised the work of the salesmen. He hired Wolstein, Woodring, Greenbaum, Fleeman and a number of others to act as salesmen, assigned the men to their territories, gave each man a kit and told him that Beck had said that the lots would be ready for resale between 18 months and two years.

After the establishing of Commonwealth it purchased lists of names of persons who had invested in bonds and securities and a letter was sent to those residing in Minnesota, Wisconsin, Indiana, Iowa, Kansas and the two Dakotas to arouse their interest in the purchase of the burial lots, and where interest was expressed by the recipients of the letters, salesmen of Commonwealth called on them and represented to them that if the depreciated securities owned by them were turned into Commonwealth in exchange for cemetery lots at the rate of $160 per lot, the lots so purchased would be resold by Commonwealth or Crown Hill Trust within a period of two years.

When salesmen were successful in selling lots, a contract was entered into with the purchaser and forwarded to Commonwealth and deeds covering the number of lots purchased were forwarded to the purchaser or sent to the salesmen for personal delivery. The depreciated securities obtained from the purchaser were sold by Nichols for Commonwealth and the proceeds were applied on the purchase price of the lots. Of the $160 received from the purchaser on each lot, Stickney and Gordon each received a five percent commission and the salesmen a thirty percent commission. Stickney also received from Beck $5 for each lot sold, which he divided with Gordon.

A resale agreement was also entered into with each purchaser by which it was agreed that Commonwealth would resell the lots at a price fixed by the purchaser, up to a maximum of $450 per lot. The resale price was generally fixed by the salesmen so that it would appear that when the lots were resold at the price agreed upon, the purchaser would regain whatever amount he had lost by reason of his depreciation of the bonds or other securities turned in as payment for the lots.

To induce a prospective customer to enter into the contract for the purchase of the lots, a guarantee was in many instances given the customer guaranteeing the payment of fifty cents per month per lot for a period of two years. Union Standard Guarantee Company of Cleveland, Ohio, was the guarantor. This company was formed at Stickney's request and it did no other business except to guarantee the payments of premiums on the cemetery lots. Where the guarantee was used, $14 of the purchase price of the lot was forwarded to the guarantor, $12 thereof being returned to the purchaser over a period of two years, and the remaining $2 was used as a service charge.

Commonwealth closed its offices about May 1, 1937. None of the lots sold by Commonwealth to the defrauded persons were ever sold, nor was any effort made by Crown Hill Trust to resell the lots purchased by the victims. The following named appellants were employed over the following periods of time and received the amounts stated below: Stickney, $6,768.-02 for 5 months; Golby, $4,789.33 for 8 months; Gordon, $6,768 for 5 months; Greenbaum, $7,194.73 for 5 months; Harriss, $2,609 for 3 months; Ross, $3,024 for

5 months; Woodring $1,665 for 3 months and Wolstein, $4,394 for 4 months.

. The contested issues may be summarized as (1) the indictment was defective, (2) variance between the allegations of the indictment and the proof, (3) error in permitting Stickney to testify in behalf of appellee, (4) error in admission and exclusion of the evidence, (5) withdrawal of appellants from the conspiracy, (6) prejudicial remarks of the district attorney, and (7) no evidence to support the verdicts.

*First.* Appellants Ross and Golby contend that the indictment is defective in that the first 17 counts do not charge them with the use of the mails in a scheme to defraud. In other words the point is made that the indictment confined the scheme to Beck, Stickney and Gordon, and did not include the above appellants.

The first count of the indictment charges. all of the defendants by name with devising a certain scheme and artifice to defraud, and to obtain money and property by means of false pretenses, representations and promises from a class of persons then residing within the United States who owned various shares of stocks, bonds, certificates of deposit, and other securities of value, designated as the persons intended to be defrauded, then follows the names of such persons. Thereafter follows allegations as to what Beck, Stickney and Gordon did in the establishing of Commonwealth, the hiring of certain appellants as salesmen, a description of the scheme upon which the indictment was founded, and concludes that the foregoing representations and promises were false and fraudulent, and that at the time they were made by the said defendants, they, the said defendants, knew they were false. The indictment further alleged in what respect the representations and promises were false and finally alleged that the said defendants so having devised the said scheme to defraud, unlawfully use the United States mails in furtherance of said fraud.

To be sure, under the statute involved, it was necessary that the indictment charge the scheme with all such particulars as are essential to constitute the scheme so as to acquaint the accused with reasonable certainty of the nature of the accusation against him. To us it seems clear that the indictment was sufficient to inform appellants of the crime charged and to protect them .from a second prosecution for the same offense. There can be no doubt under the allegations of this indictment that they understood they were being charged with the crime of using the mails to obtain money by means of false and fraudulent representations and promises and conspiracy so to do. Moreover, the sufficiency of the indictment is challenged for the first time in this court. After verdict, every intendment must be indulged in support of the indictment. No objection can avail, no prejudice appearing.[1]

*Second.* Appellants Ross and Golby next contend that a fatal variance existed between the allegations of the indictment and the proof. They insist that the allegations of the last count, charging. a conspiracy to use the mails and a scheme to defraud, were not proved, but if appellee proved any at all, it proved a number of independent conspiracies. The basis of the argument is that one group of salesmen made one type of misrepresentation, another group made a different misrepresentation and other groups of salesmen made still different representations. In support of this contention counsel cited the cases in the footnote.[2] These cases are to the effect that where one conspiracy is specially charged, proof of different and disconnected ones will not sustain conviction. We do not question the correctness of the proposition stated by these cases, but we do not think they are applicable here. In our case the substance of the charge with respect to the scheme is that the defendants, actuated by a fraudulent intent, devised a scheme to induce the persons named in the indictment to purchase cemetery lots. If there was a general plan in which all the defendants participated and if all the misrepresentations made were in furtherance of that conspiracy, the fact that one group of salesmen made one type of misrepresentation and another a different misrepresentation

---

[1] Dealy v. United States, 152 U.S. 539, 14 S.Ct. 680, 38 L.Ed. 545; Hagner v. United States, 285 U.S. 427, 431, 52 S.Ct. 417, 76 L.Ed. 861; Coates v. United States, 9 Cir., 59 F.2d 173; Crapo v. United States, 10 Cir., 100 F.2d 996; and Hewitt v. United States, 8 Cir., 110 F.2d 1.

[2] Terry v. United States, 9 Cir., 7 F.2d. 28; Wyatt v. United States, 3 Cir., 23 F. 2d 791; Tinsley v. United States, 8 Cir., 43 F.2d 890; Dowdy v. United States, 4 Cir., 46 F.2d 417; Marcante v. United States, 10 Cir., 49 F.2d 156; and United States v. Siebricht, 2 Cir., 59 F.2d 976.

would not divide the conspiracy charged into separate conspiracies.

■ *Third.* Appellant Beck contends it was reversible error for appellant Stickney to testify for the appellee. The point is that the calling of Stickney tended to deprive Beck of a fair trial. We are of the opinion the point is not well taken.

In Heitler v. United States, 7 Cir., 244 F. 140, 141, our court had occasion to discuss a somewhat similar problem and in that case it was said: "In general, defendants on trial, if testifying at their own request, are competent witnesses for the government against their codefendants on trial with them. The act of Congress of March 16, 1878 [28 U.S.C.A. § 632] provides that in the trial of indictments, informations, etc., the person charged shall at his own request, and not otherwise, be a competent witness * * *. This act renders any of a plurality of defendants on trial competent to testify either in his own behalf, or on behalf of any codefendant, or the government, provided only that he testifies at his own request."

In the instant case the record discloses that on the fourth day of the trial, the district attorney called Stickney to the witness stand. Thereupon, but not in the presence of the jury, the trial judge informed Stickney that he was not obliged to testify and furthermore that he would not permit him to do so unless it was at his (Stickney's) own request, to which Stickney replied that he knew his rights and at his own request desired to testify.

In his brief, counsel for Beck argues that Stickney was in continual conference with Beck up to the time he was called as a witness and neither Beck nor his counsel had any prior knowledge that he was to be called as a witness by appellee; that Stickney's testimony must have led the jury to conclude that Stickney's sins were likewise the sins of Beck. The trouble with this argument is that there is nothing in this record indicating that Beck has been prejudiced; consequently, we are unable to say that Beck was deprived of a fair and impartial trial.

*Fourth.* Appellants contend that the court erred in the admission and exclusion of evidence. Under this contention numerous complaints are made. We shall not discuss all of them, but we desire to say that we have examined and considered them all and have concluded that neither those herein discussed, nor those not discussed, warrant a reversal.

■ The record discloses that one Swendiman, an attorney at law, testified that he represented William D. Brown (Brown was one of the persons who had been induced to purchase lots through appellant Woodring); that as Brown's attorney he had corresponded with Commonwealth. His letters to Commonwealth and answers thereto were received in evidence. The substance of this correspondence was that it was claimed that the transaction with Brown had been carried out through misrepresentations and in violation of the Securities Law of Minnesota and that Commonwealth admitted it had been ordered by the Minnesota Securities Division to cease and desist from further sales within that state.

It also appears that one Wells, a purchaser of lots, testified that appellant Golby had assured him that he could get a resale price of $600 for a lot; that at the time this representation was made Wells and Golby were in Henderson, Kentucky; that Golby called the Chicago office of the Commonwealth, spoke to some person and then handed the telephone to Wells. Wells then inquired if Golby was authorized to quote "terms like that; whether the office ratified it" and the man assured Wells that he was. Thereafter Commonwealth's letter to Wells was introduced in evidence. In this letter appears the following statement: "Your letter was the first intimation we had received concerning any statement, written or otherwise, by Mr. Golby, that your burial rights were to be resold at any specific time. We sold these rights on the wholesale plan and accepted a resale listing at a stipulated net price to you. Either we or our authorized selling agent were to resell the rights as early as possible, but not within any specified period." In still another letter addressed to Wells, Commonwealth stated: "If you feel that you have been defrauded it is, of course, your privilege to call the facts to the attention of the authorities. We stand ready to defend our actions in the premises. As to Mr. Golby, if he committed any crime he deserves to be punished."

■ The trial court admitted the letters to show guilty knowledge as to the methods employed by the salesman in mak-

ing sales and for that purpose we believe they were competent. Osborne v. United States, 9 Cir., 17 F.2d 246, 250.

Complaint is also made that it was error to permit Auditor Robinson to testify with respect to his examination of the books of Commonwealth. Robinson testified he was a postoffice inspector and had been employed in accounting work for 30 years; that he examined Commonwealth's ledger accounts showing commissions paid to salesmen, check stubs, cancelled checks, distribution of expense items, sales records and daily collections and that his analysis of the sales records indicated that there were 252 lots that were purchased for $25 each. On cross-examination however he testified that the books did not in fact show the purchase of any lot at $25, but that he obtained that information from an invoice which he found during his examination of the records of Crown Hill. The record also discloses that Helen B. Nichols had theretofore on cross-examination testified that some of the lots had been purchased at $25. Under the circumstances we fail to see wherein the testimony could be at all prejudicial.

Appellant Stickney makes the point that it was error to admit in evidence the minute books of Crown Hill, Inc., and Crown Hill Trust. They were competent as tending to show the value of the lots being sold by Commonwealth.

Appellants Ross and Golby contend that the trial court should have permitted James B. Black to testify to a conversation he had with one Komlas on the development of Crown Hill Cemetery.

It appears that in 1929 Black came to Cleveland to work for Beck in connection with the construction of Crown Hill Cemetery and remained until the fall of 1937. During these years the development work was in his charge.

After December 15, 1936 one Komlas and his associates owned Crown Hill Cemetery. Prior to the purchase by Komlas, Black and Komlas had a conversation relative to the amount of development work yet to be done. He was then asked to relate the conversation to which appellee objected and the objection was sustained. Counsel for appellants then offered to prove that Black, in his conversation with Komlas, stated he had estimated the costs for the final development of the undeveloped lots

at $125,000. Under this state of the record, we see no error in the court's ruling.

*Fifth.* Appellants Beck, Stickney, Fleeman, Wolstein, Harriss and Woodring next contend that if a scheme actually existed, they severed all connection with it before the offense charged was committed. The argument is that since all the mailings alleged in the indictment were after their respective withdrawals from the scheme alleged, they had no further responsibility for the possible continuation of the scheme to defraud.

Before proceeding to consider the law applicable it may be well to state the facts. The record discloses that appellant Beck resigned from Crown Hill, Inc., and Crown Hill Trust on December 15, 1936, but it also appears that in May 1937, at the time that Commonwealth closed its offices (after the date alleged in the first and last count of the indictment), he informed Mrs. Nichols to re-deed those lots which remained unsold by Commonwealth to the First Refunding Corporation of Cleveland. Regarding Stickney, it appears that he submitted his resignation to trustee Nichols on October 7, 1936; that she called Beck and told him of Stickney's resignation; that after his resignation he left for Boston but thereafter returned to and worked for the Gil-Boat Company, a subtenant of Commonwealth where he remained until February 1937, during which time he wrote a number of letters for Commonwealth. Fleeman left Commonwealth's offices in July 1936 and Wolstein left in October 1936; Harriss' employment commenced in August 1936 and he left in November 1936, while Woodring left on September 16, 1936. So far as Fleeman, Wolstein, Harriss and Woodring are concerned, nothing more appears in the record than the fact that they left Commonwealth.

The general rule is that where an overt act is essential to a conspiracy, a conspirator may avoid guilt by withdrawing from the conspiracy prior to the commission of an overt act, 15 C.J.S., Conspiracy, § 78, p. 1110. However, when once a conspiracy is shown to exist, which is not ended merely by lapse of time, it continues to exist as to all persons involved until there is shown some affirmative act of withdrawal by the persons who attempt to evade responsibility for the acts and declarations of their co-conspirators

after the withdrawal.[3] Here the scheme was to continue over a long period of time. In such a case where the conspiracy is proved, the acts and declarations of one of the conspirators toward the accomplishment of the unlawful scheme are the acts of all. Bogy v. United States, 6 Cir., 96 F.2d 734, 741. In the instant case mailings on various dates were alleged, but all were alleged to be a part of one scheme. Under such circumstances whether an effective withdrawal was made by the taking of affirmative action was a question of fact for the jury.[4]

■ *Sixth.* We now consider the alleged misconduct of the assistant district attorney. Counsel for appellants argue that his conduct was such as to prejudice the jury. The argument has to do with the cross-examination of appellants Beck, Golby and Woodring. We have examined the particular instances cited and are not ready to say that the cross-examination was indicative of unfairness and that it was prejudicial in view of the evidence in this case.

■ *Seventh.* We come finally to the contention that there is no evidence to support the verdicts. It is clear from the facts already shown that there is not the slightest doubt or uncertainty as to the evidence of fraud as it relates to appellants Beck, Stickney and Gordon. These three boldly conceived and brazenly executed the scheme to fleece the public, United States v. Wise, 7 Cir., 108 F.2d 379, 380. We shall therefore pass on to a review of the evidence as it relates to the other appellants.

*Barney Wolstein.* Charles Cockle, a hardware dealer, and Earl B. Fox, a 75-year old retired rural mail carrier, testified that Wolstein represented that if their securities were exchanged for cemetery lots they would receive back a resale price, to be fixed by them, within 18 months and two years respectively. To Fox he said it was "sure as death." Wolstein testified that he had believed the representations were true and that in arriving at the resale figures for customers he aweays fixed the resale price at such an amount so that the customers would receive, if the lots were resold, the amount which they had lost by reason of the depreciation of their securities.

*William Woodring.* This appellant commenced work for Crown Hill as a driver in 1933 and later as a salesman. He was implicated by the testimony of William and Edna Benz and William D. Brown. The Benzes testified that Woodring came to their home on June 22, 1936, and said that they (Benzes) could turn in their bonds and liquidate their losses by investing in the lots for which they would receive, at the end of 24 months, $450 for each lot. To Brown he represented that the lots were in a well developed part of the cemetery and would be resold within 24 months at $450 per lot; that Commonwealth had 70 men employed in Cleveland reselling lots at anywhere from $500 to $1,000 a lot and that the proposition was one of the surest of businesses, "as good as Government bonds," and that he was familiar with the cemetery and knew the lots sold to Brown and the Benzes were in an undeveloped, remote section of the cemetery.

*Harold Ross.* Three of the victims testified against Ross. In his talks with Westhafer, a school teacher, he told her he knew she had bonds that had ceased to pay; that he represented a corporation which hoped to get a controlling interest in the bonds, without mentioning at that time anything about cemetery lots. Later, he said, cemetery lots would be given to her as security for her bonds and would be sold within two years at $450 per lot. He followed the same procedure with McCord, a 70-year old farmer. Before Ross called on McCord, McCord had received a card through the mails, inquiring if he had any securities; upon McCord's answering Ross called and was given a list of the securities. Ross said the lots would be worth double the amount of the bonds and that he would guarantee that price for the lots within two years. To McCrory he

[3] Hyde v. United States, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114, Ann.Cas. 1914A, 614; Local 167, etc., et al. v. United States, 291 U.S. 293, 298, 54 S. Ct. 396, 78 L.Ed. 804; United States v. Borden Co., 308 U.S. 188, 202, 60 S.Ct. 182, 84 L.Ed. 181; United States v. Rollnick, 2 Cir., 91 F.2d 911, 918; United States v. Anderson, 7 Cir., 101 F.2d 325, 331; and United States v. Weiss, 2 Cir., 103 F.2d 348, 354.

[4] Hyde v. United States, supra; Reuben v. United States, 7 Cir., 86 F.2d 464, 469; United States v. Dubrin, 2 Cir., 93 F.2d 499, 504; United States v. Weiss, 2 Cir., 103 F.2d 348, 354; and United States v. Bob, 2 Cir., 106 F.2d 37, 39, 125 A.L.R. 502.

represented that the lots would be sold within two years at $500 per lot.

*Mort D. Greenbaum.* This appellant was implicated by the testimony of Rosa Reamer, Martin E. Norton, Edward L. Berg and Nye McCrory. These witnesses testified that they had been contacted by other salesmen before Greenbaum appeared on the scene. Reamer testified that in September 1936 Greenbaum told her if she made an additional investment in the lots she would double her money within nine months because of the sales program "they were putting on." Brown, who had previously been sold by Woodring, was contacted by Greenbaum and was told that if he would put up bonds as collateral he would be given lots for the bonds and they would be used to finish a Cathedral at the cemetery and that at the end of two years, his bonds would be returned, together with the difference between $450 and $160. His bonds were not returned.

Norton, who had been previously sold by Woodring, testified that Greenbaum told him that Crown Hill had sold a large number of lots to a fraternal organization and had $700,000 on hand which was soon to be distributed, and that if Norton deposited additional collateral, Norton would get his money back inside of 10 months.

*H. W. Fleeman.* Robert Little, a mail carrier, Nellie E. Burton and Charles Pierce testified against this appellant. Fleeman represented to Little that the lots would be resold within two years at $450 per lot. To Burton he said the lots would be in a good place; they were in front, no trouble in selling them; they would be one of the first to be sold. Neither Fleeman, Greenbaum nor Ross testified in his own defense.

*Jack Harriss.* Testimony implicating this appellant was given by Charles Prokop and Bernice Albrecht. They had been solicited by co-defendant Shayer and induced to part with their securities upon Shayer's representations that Commonwealth could offer to pay a higher price for the securities, since it did not have to pay "property or income tax on the cemetery." Prokop's securities were valued at $18,000 and at the time he delivered the securities to Shayer he was told he would receive $18,000 in money. Instead of cash, he was given deeds to lots in the cemetery. Shayer also told Albrecht that she would be paid in cash or United States Government bonds.

In both instances, a few days after Shayer's call, Harriss delivered deeds to cemetery lots to Miss Albrecht and Prokop. To Miss Albrecht he said "everything would be all right, but that it would be at least six months before she could get anything, as it would take that long for lawyers to straighten out the papers; that the longer she left her money in the more she would make, but that she had it take it out after 24 months." He advised Prokop to place the deeds in his safe and at the end of sixty days he would receive cash for them. After each of these deals Harriss and Shayer returned to Chicago and divided the commissions.

*Harry D. Golby.* Three witnesses testified against Golby. In selling lots to George H. Wells, a retired school teacher, Golby represented the lots would be sold within one year. With respect to McCord and Nye McCrory, he followed up Ross. In November 1936 he called upon McCrory and told him he represented Commonwealth and had good news; that Commonwealth had a reserve fund which either had to be paid to the Government or to lot owners and would be paid prior to May 1, 1937. As a result of these representations McCrory was induced to purchase additional lots. In his own behalf Golby testified that he merely followed instructions given to him and in making the representations he relied on the kit he received from Commonwealth.

While it is true that if the evidence is as consistent with innocence as with guilt, no conviction can be had, it is also true that overt acts of the accused may be considered with all the other evidence in determining his guilt. And where the overt acts are of a character that are usually, if not necessarily, done pursuant to a previous scheme and plan, proofs of the acts have a tendency to show such pre-existing conspiracy, so that when proved they may be considered as evidence of the conspiracy charged, and if the established facts and inescapable inferences are inconsistent with the accused's professions of innocence, it becomes the problem of the jury to weigh the evidence and determine, under proper instructions dealing with the quantum of evidence of proof necessary to convict, the guilt or innocence of the accused.

And so in this case it was proper for the jury to consider all of the evidence and from all the facts and circumstances de-

termine whether the crimes charged in the indictment had been established beyond a reasonable doubt. Each of these appellants were identified and proved to have told some of the falsehoods which furthered the scheme to work on the sale of the lots. There was enough against each of them to require that the evidence be submitted to the jury for its determination as to whether each was connected with the fraudulent scheme in furtherance of which the mails were used, and the jury has rendered verdicts against the appellants which are binding on us.

We have now considered all of the assignments of error and being convinced that no error has intervened justifying a reversal, the judgments of the District Court will therefore be affirmed.